## BUCKHANNON BOARD & CARE HOME, INC., ET AL. v. WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES ET AL.

No. 99–1848.   Argued February 27, 2001—Decided May 29, 2001

Webster J. Arceneaux III argued the cause for petitioners. With him on the briefs was *Brian A. Glasser.*

*Beth S. Brinkmann* argued the cause for the United States as *amicus curiae* urging reversal. With her on the brief were former *Solicitor General Waxman, Acting Solicitor General Underwood, Assistant Attorney General Lee, Jeffrey P. Minear, Jessica Dunsay Silver,* and *Kevin K. Russell.*

*David P. Cleek,* Senior Deputy Attorney General of West Virginia, argued the cause for respondents. With him on the brief was *Darrell V. McGraw, Jr.,* Attorney General.*

---

*Briefs of *amici curiae* urging reversal were filed for the Friends of the Earth et al. by *Bruce J. Terris, Carolyn Smith Pravlik,* and *Sarah A. Adams;* and for Public Citizen et al. by *Steven R. Shapiro, Harvey Grossman, Brian Wolfman,* and *Arthur B. Spitzer.*

Briefs of *amici curiae* urging affirmance were filed for the State of Maryland et al. by *J. Joseph Curran, Jr.,* Attorney General of Maryland, and *Maureen M. Dove* and *Andrew H. Baida,* Assistant Attorneys General, and by the Attorneys General for their respective States as follows: *Bill Pryor* of Alabama, *Bill Lockyer* of California, *Ken Salazar* of Colorado, *M. Jane Brady* of Delaware, *Robert A. Butterworth* of Florida, *James E. Ryan* of Illinois, *Carla J. Stovall* of Kansas, *Richard P. Ieyoub* of Louisiana, *Thomas F. Reilly* of Massachusetts, *Jeremiah W. (Jay) Nixon* of Missouri, *Joseph P. Mazurek* of Montana, *Don Stenberg* of Ne-

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

Numerous federal statutes allow courts to award attorney's fees and costs to the "prevailing party." The question presented here is whether this term includes a party that has failed to secure a judgment on the merits or a court-ordered consent decree, but has nonetheless achieved the desired result because the lawsuit brought about a voluntary change in the defendant's conduct. We hold that it does not.

Buckhannon Board and Care Home, Inc., which operates care homes that provide assisted living to their residents, failed an inspection by the West Virginia Office of the State Fire Marshal because some of the residents were incapable of "self-preservation" as defined under state law. See W. Va. Code §§ 16-5H-1, 16-5H-2 (1998) (requiring that all residents of residential board and care homes be capable of "self-preservation," or capable of moving themselves "from situations involving imminent danger, such as fire"); W. Va. Code of State Rules, tit. 87, ser. 1, § 14.07(1) (1995) (same). On October 28, 1997, after receiving cease-and-desist orders requiring the closure of its residential care facilities within 30 days, Buckhannon Board and Care Home, Inc., on behalf of itself and other similarly situated homes and residents (hereinafter petitioners), brought suit in the United States

---

braska, *Philip T. McLaughlin* of New Hampshire, *Michael F. Easley* of North Carolina, *Heidi Heitkamp* of North Dakota, *Betty D. Montgomery* of Ohio, *W. A. Drew Edmondson* of Oklahoma, *Hardy Myers* of Oregon, *D. Michael Fisher* of Pennsylvania, *Sheldon Whitehouse* of Rhode Island, *Charles M. Condon* of South Carolina, *Mark Barnett* of South Dakota, *Paul G. Summers* of Tennessee, *John Cornyn* of Texas, *Jan Graham* of Utah, and *Mark L. Earley* of Virginia; for the Alliance of Automobile Manufacturers, Inc., by *Charles A. Newman* and *Jerome H. Block;* for Los Angeles County et al. by *Elwood Lui* and *Jeffrey S. Sutton;* for the National Conference of State Legislatures et al. by *Richard Ruda, James I. Crowley, Jacqueline G. Cooper,* and *Paul J. Watford;* and for the Pacific Legal Foundation by *M. Reed Hopper.*

District Court for the Northern District of West Virginia against the State of West Virginia, two of its agencies, and 18 individuals (hereinafter respondents), seeking declaratory and injunctive relief[1] that the "self-preservation" requirement violated the Fair Housing Amendments Act of 1988 (FHAA), 102 Stat. 1619, 42 U. S. C. § 3601 *et seq.*, and the Americans with Disabilities Act of 1990 (ADA), 104 Stat. 327, 42 U. S. C. § 12101 *et seq.*

Respondents agreed to stay enforcement of the cease-and-desist orders pending resolution of the case and the parties began discovery. In 1998, the West Virginia Legislature enacted two bills eliminating the "self-preservation" requirement, see S. 627, I 1998 W. Va. Acts 983–986 (amending regulations); H. R. 4200, II 1998 W. Va. Acts 1198–1199 (amending statute), and respondents moved to dismiss the case as moot. The District Court granted the motion, finding that the 1998 legislation had eliminated the allegedly offensive provisions and that there was no indication that the West Virginia Legislature would repeal the amendments.[2]

Petitioners requested attorney's fees as the "prevailing party" under the FHAA, 42 U. S. C. § 3613(c)(2) ("[T]he court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee and costs"), and ADA, 42 U. S. C. § 12205 ("[T]he court . . . , in its discretion, may allow the prevailing party . . . a reasonable attorney's fee, including litigation expenses, and costs"). Petitioners argued that they were entitled to attorney's fees under the "catalyst theory," which posits that a plaintiff is a "prevailing party" if it achieves the desired result because the lawsuit brought about a voluntary change in the defendant's conduct. Al-

---

[1] The original complaint also sought money damages, but petitioners relinquished this claim on January 2, 1998. See App. to Pet. for Cert. A11.

[2] The District Court sanctioned respondents under Federal Rule of Civil Procedure 11 for failing to timely provide notice of the legislative amendment. App. 147.

though most Courts of Appeals recognize the "catalyst theory,"[3] the Court of Appeals for the Fourth Circuit rejected it in *S–1 and S–2* v. *State Bd. of Ed. of N. C.*, 21 F. 3d 49, 51 (1994) (en banc) ("A person may not be a 'prevailing party' . . . except by virtue of having obtained an enforceable judgment, consent decree, or settlement giving some of the legal relief sought"). The District Court accordingly denied the motion and, for the same reason, the Court of Appeals affirmed in an unpublished, *per curiam* opinion. Judgt. order reported at 203 F. 3d 819 (CA4 2000).

To resolve the disagreement amongst the Courts of Appeals, we granted certiorari, 530 U. S. 1304 (2000), and now affirm.

In the United States, parties are ordinarily required to bear their own attorney's fees—the prevailing party is not entitled to collect from the loser. See *Alyeska Pipeline Service Co.* v. *Wilderness Society*, 421 U. S. 240, 247 (1975). Under this "American Rule," we follow "a general practice of not awarding fees to a prevailing party absent explicit statutory authority." *Key Tronic Corp.* v. *United States*, 511 U. S. 809, 819 (1994). Congress, however, has authorized the award of attorney's fees to the "prevailing party" in numerous statutes in addition to those at issue here, such as the Civil Rights Act of 1964, 78 Stat. 259, 42 U. S. C. § 2000e–5(k), the Voting Rights Act Amendments of 1975, 89 Stat. 402, 42 U. S. C. § 1973*l*(e), and the Civil Rights Attorney's

---

[3] See, *e. g., Stanton* v. *Southern Berkshire Regional School Dist.*, 197 F. 3d 574, 577, n. 2 (CA1 1999); *Marbley* v. *Bane*, 57 F. 3d 224, 234 (CA2 1995); *Baumgartner* v. *Harrisburg Housing Authority*, 21 F. 3d 541, 546–550 (CA3 1994); *Payne* v. *Board of Ed.*, 88 F. 3d 392, 397 (CA6 1996); *Zinn* v. *Shalala*, 35 F. 3d 273, 276 (CA7 1994); *Little Rock School Dist.* v. *Pulaski Cty. School Dist., #1*, 17 F. 3d 260, 263, n. 2 (CA8 1994); *Kilgour* v. *Pasadena*, 53 F. 3d 1007, 1010 (CA9 1995); *Beard* v. *Teska*, 31 F. 3d 942, 951–952 (CA10 1994); *Morris* v. *West Palm Beach*, 194 F. 3d 1203, 1207 (CA11 1999).

Fees Awards Act of 1976, 90 Stat. 2641, 42 U. S. C. § 1988. See generally *Marek* v. *Chesny*, 473 U. S. 1, 43–51 (1985) (Appendix to opinion of Brennan, J., dissenting).[4]

In designating those parties eligible for an award of litigation costs, Congress employed the term "prevailing party," a legal term of art. Black's Law Dictionary 1145 (7th ed. 1999) defines "prevailing party" as "[a] party in whose favor a judgment is rendered, regardless of the amount of damages awarded <in certain cases, the court will award attorney's fees to the prevailing party>. — Also termed *successful party*." This view that a "prevailing party" is one who has been awarded some relief by the court can be distilled from our prior cases.[5]

In *Hanrahan* v. *Hampton*, 446 U. S. 754, 758 (1980) *(per curiam)*, we reviewed the legislative history of § 1988 and found that "Congress intended to permit the interim award of counsel fees only when a party has prevailed on the merits of at least some of his claims." Our "[r]espect for ordinary language requires that a plaintiff receive at least some relief on the merits of his claim before he can be said to prevail."

---

[4] We have interpreted these fee-shifting provisions consistently, see *Hensley* v. *Eckerhart*, 461 U. S. 424, 433, n. 7 (1983), and so approach the nearly identical provisions at issue here.

[5] We have never had occasion to decide whether the term "prevailing party" allows an award of fees under the "catalyst theory" described above. Dictum in *Hewitt* v. *Helms*, 482 U. S. 755, 760 (1987), alluded to the possibility of attorney's fees where "voluntary action by the defendant . . . affords the plaintiff all or some of the relief . . . sought," but we expressly reserved the question, see *id.*, at 763 ("We need not decide the circumstances, if any, under which this 'catalyst' theory could justify a fee award"). And though the Court of Appeals for the Fourth Circuit relied upon our decision in *Farrar* v. *Hobby*, 506 U. S. 103 (1992), in rejecting the "catalyst theory," *Farrar* "involved no catalytic effect." *Friends of Earth, Inc.* v. *Laidlaw Environmental Services (TOC), Inc.*, 528 U. S. 167, 194 (2000). Thus, there is language in our cases supporting both petitioners and respondents, and last Term we observed that it was an open question here. See *ibid.*

*Hewitt* v. *Helms*, 482 U. S. 755, 760 (1987). We have held that even an award of nominal damages suffices under this test. See *Farrar* v. *Hobby*, 506 U. S. 103 (1992).[6]

In addition to judgments on the merits, we have held that settlement agreements enforced through a consent decree may serve as the basis for an award of attorney's fees. See *Maher* v. *Gagne*, 448 U. S. 122 (1980). Although a consent decree does not always include an admission of liability by the defendant, see, *e. g., id.,* at 126, n. 8, it nonetheless is a court-ordered "chang[e] [in] the legal relationship between [the plaintiff] and the defendant." *Texas State Teachers Assn.* v. *Garland Independent School Dist.,* 489 U. S. 782, 792 (1989) (citing *Hewitt, supra,* at 760–761, and *Rhodes* v. *Stewart,* 488 U. S. 1, 3–4 (1988) *(per curiam)*).[7] These decisions, taken together, establish that enforceable judgments on the merits and court-ordered consent decrees create the "material alteration of the legal relationship of the parties" necessary to permit an award of attorney's fees. 489 U. S., at 792–793; see also *Hanrahan, supra,* at 757 ("[I]t seems clearly to have been the intent of Congress to permit . . . an interlocutory award only to a party who has established his entitlement to some relief on the merits of his claims, either in the *trial court* or *on appeal*" (emphasis added)).

---

[6] However, in some circumstances such a "prevailing party" should still not receive an award of attorney's fees. See *Farrar* v. *Hobby, supra,* at 115–116.

[7] We have subsequently characterized the *Maher* opinion as also allowing for an award of attorney's fees for private settlements. See *Farrar* v. *Hobby, supra,* at 111; *Hewitt* v. *Helms, supra,* at 760. But this dictum ignores that *Maher* only "held that fees *may* be assessed . . . after a case has been settled by the entry of a consent decree." *Evans* v. *Jeff D.,* 475 U. S. 717, 720 (1986). Private settlements do not entail the judicial approval and oversight involved in consent decrees. And federal jurisdiction to enforce a private contractual settlement will often be lacking unless the terms of the agreement are incorporated into the order of dismissal. See *Kokkonen* v. *Guardian Life Ins. Co. of America,* 511 U. S. 375 (1994).

We think, however, the "catalyst theory" falls on the other side of the line from these examples. It allows an award where there is no judicially sanctioned change in the legal relationship of the parties. Even under a limited form of the "catalyst theory," a plaintiff could recover attorney's fees if it established that the "complaint had sufficient merit to withstand a motion to dismiss for lack of jurisdiction or failure to state a claim on which relief may be granted." Brief for United States as *Amicus Curiae* 27. This is not the type of legal merit that our prior decisions, based upon plain language and congressional intent, have found necessary. Indeed, we held in *Hewitt* that an interlocutory ruling that reverses a dismissal for failure to state a claim "is not the stuff of which legal victories are made." 482 U. S., at 760. See also *Hanrahan, supra,* at 754 (reversal of a directed verdict for defendant does not make plaintiff a "prevailing party"). A defendant's voluntary change in conduct, although perhaps accomplishing what the plaintiff sought to achieve by the lawsuit, lacks the necessary judicial *imprimatur* on the change. Our precedents thus counsel against holding that the term "prevailing party" authorizes an award of attorney's fees *without* a corresponding alteration in the legal relationship of the parties.

The dissenters chide us for upsetting "long-prevailing *Circuit* precedent." *Post,* at 622 (opinion of GINSBURG, J.) (emphasis added). But, as JUSTICE SCALIA points out in his concurrence, several Courts of Appeals have relied upon dicta in our prior cases in approving the "catalyst theory." See *post,* at 621–622; see also *supra,* at 603, n. 5. Now that the issue is squarely presented, it behooves us to reconcile the plain language of the statutes with our prior *holdings.* We have only awarded attorney's fees where the plaintiff has received a judgment on the merits, see, *e. g., Farrar, supra,* at 112, or obtained a court-ordered consent decree, *Maher, supra,* at 129–130—we have not awarded attorney's fees where the plaintiff has secured the reversal of a directed

verdict, see *Hanrahan*, 446 U. S., at 759, or acquired a judicial pronouncement that the defendant has violated the Constitution unaccompanied by *"judicial* relief," *Hewitt, supra,* at 760 (emphasis added). Never have we awarded attorney's fees for a nonjudicial "alteration of actual circumstances." *Post,* at 633 (dissenting opinion). While urging an expansion of our precedents on this front, the dissenters would simultaneously abrogate the "merit" requirement of our prior cases and award attorney's fees where the plaintiff's claim "was at least colorable" and "not . . . groundless." *Post,* at 627 (internal quotation marks and citation omitted). We cannot agree that the term "prevailing party" authorizes federal courts to award attorney's fees to a plaintiff who, by simply filing a nonfrivolous but nonetheless potentially meritless lawsuit (it will never be determined), has reached the "sought-after destination" without obtaining any judicial relief. *Post,* at 634 (internal quotation marks and citation omitted).[8]

---

[8] Although the dissenters seek support from *Mansfield, C. & L. M. R. Co.* v. *Swan,* 111 U. S. 379 (1884), that case involved costs, not attorney's fees. "[B]y the long established practice and universally recognized rule of the common law . . . the prevailing party is entitled to recover a judgment for costs," *id.,* at 387, but "the rule 'has long been that attorney's fees are not ordinarily recoverable,'" *Alyeska Pipeline Service Co.* v. *Wilderness Society,* 421 U. S. 240, 257 (1975) (quoting *Fleischmann Distilling Corp.* v. *Maier Brewing Co.,* 386 U. S. 714, 717 (1967)). Courts generally, and this Court in particular, then and now, have a presumptive rule for costs which the Court in its discretion may vary. See, *e. g.,* this Court's Rule 43.2 ("If the Court reverses or vacates a judgment, the respondent or appellee shall pay costs unless the Court otherwise orders"). In *Mansfield,* the defendants had successfully removed the case to federal court, successfully opposed the plaintiffs' motion to remand the case to state court, lost on the merits of the case, and then reversed course and successfully argued in this Court that the lower federal court had no jurisdiction. The Court awarded costs to the plaintiffs, even though they had lost and the defendants won on the jurisdictional issue, which was the only question this Court decided. In no ordinary sense of the word can the plaintiffs have been said to be the prevailing party here—they lost and their opponents won on the only litigated issue—so the Court's use of the term must be regarded as a figurative rather than a literal one, justifying the

Petitioners nonetheless argue that the legislative history of the Civil Rights Attorney's Fees Awards Act supports a broad reading of "prevailing party" which includes the "catalyst theory." We doubt that legislative history could overcome what we think is the rather clear meaning of "prevailing party"—the term actually used in the statute. Since we resorted to such history in *Garland*, 489 U. S., at 790, *Maher*, 448 U. S., at 129, and *Hanrahan, supra,* at 756–757, however, we do likewise here.

The House Report to § 1988 states that "[t]he phrase 'prevailing party' is not intended to be limited to the victor only after entry of a final judgment following a full trial on the merits," H. R. Rep. No. 94–1558, p. 7 (1976), while the Senate Report explains that "parties may be considered to have prevailed when they vindicate rights through a consent judgment or without formally obtaining relief," S. Rep. No. 94–1011, p. 5 (1976). Petitioners argue that these Reports and their reference to a 1970 decision from the Court of Appeals for the Eighth Circuit, *Parham* v. *Southwestern Bell Telephone Co.*, 433 F. 2d 421 (1970), indicate Congress' intent to adopt the "catalyst theory."[9] We think the legislative his-

---

departure from the presumptive rule allowing costs to the prevailing party because of the obvious equities favoring the plaintiffs. The Court employed its discretion to recognize that the plaintiffs had been the victims of the defendants' legally successful whipsawing tactics.

[9] Although the Court of Appeals in *Parham* awarded attorney's fees to the plaintiff because his "lawsuit acted as a catalyst which prompted the [defendant] to take action . . . seeking compliance with the requirements of Title VII," 433 F. 2d, at 429–430, it did so only after finding that the defendant had acted unlawfully, see *id.,* at 426 ("We hold as a matter of law that [plaintiff's evidence] established a violation of Title VII"). Thus, consistent with our holding in *Farrar, Parham* stands for the proposition that an enforceable judgment permits an award of attorney's fees. And like the consent decree in *Maher* v. *Gagne,* 448 U. S. 122 (1980), the Court of Appeals in *Parham* ordered the District Court to "retain jurisdiction over the matter for a reasonable period of time to insure the continued implementation of the appellee's policy of equal employment opportunities." 433 F. 2d, at 429. Clearly *Parham* does not

tory cited by petitioners is at best ambiguous as to the availability of the "catalyst theory" for awarding attorney's fees. Particularly in view of the "American Rule" that attorney's fees will not be awarded absent "explicit statutory authority," such legislative history is clearly insufficient to alter the accepted meaning of the statutory term. *Key Tronic*, 511 U. S., at 819; see also *Hanrahan, supra*, at 758 ("[O]nly when a party has prevailed on the merits of at least some of his claims . . . has there been a determination of the 'substantial rights of the parties,' which Congress determined was a necessary foundation for departing from the usual rule in this country that each party is to bear the expense of his own attorney" (quoting H. R. Rep. No. 94–1558, at 8)).

Petitioners finally assert that the "catalyst theory" is necessary to prevent defendants from unilaterally mooting an action before judgment in an effort to avoid an award of attorney's fees. They also claim that the rejection of the "catalyst theory" will deter plaintiffs with meritorious but expensive cases from bringing suit. We are skeptical of these assertions, which are entirely speculative and unsupported by any empirical evidence (*e. g.*, whether the number of suits brought in the Fourth Circuit has declined, in relation to other Circuits, since the decision in *S–1 and S–2*).

Petitioners discount the disincentive that the "catalyst theory" may have upon a defendant's decision to voluntarily change its conduct, conduct that may not be illegal. "The defendants' potential liability for fees in this kind of litigation can be as significant as, and sometimes even more significant than, their potential liability on the merits," *Evans* v. *Jeff D.*, 475 U. S. 717, 734 (1986), and the possibility of being assessed attorney's fees may well deter a defendant from altering its conduct.

And petitioners' fear of mischievous defendants only materializes in claims for equitable relief, for so long as the

support a theory of fee shifting untethered to a material alteration in the legal relationship of the parties as defined by our precedents.

plaintiff has a cause of action for damages, a defendant's change in conduct will not moot the case.[10] Even then, it is not clear how often courts will find a case mooted: "It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice" unless it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of Earth, Inc.* v. *Laidlaw Environmental Services (TOC), Inc.*, 528 U. S. 167, 189 (2000) (internal quotation marks and citations omitted). If a case is not found to be moot, and the plaintiff later procures an enforceable judgment, the court may of course award attorney's fees. Given this possibility, a defendant has a strong incentive to enter a settlement agreement, where it can negotiate attorney's fees and costs. Cf. *Marek* v. *Chesny*, 473 U. S., at 7 ("[M]any a defendant would be unwilling to make a binding settlement offer on terms that left it exposed to liability for attorney's fees in whatever amount the court might fix on motion of the plaintiff" (internal quotation marks and citation omitted)).

We have also stated that "[a] request for attorney's fees should not result in a second major litigation," *Hensley* v. *Eckerhart*, 461 U. S. 424, 437 (1983), and have accordingly avoided an interpretation of the fee-shifting statutes that would have "spawn[ed] a second litigation of significant dimension," *Garland, supra,* at 791. Among other things, a "catalyst theory" hearing would require analysis of the defendant's subjective motivations in changing its conduct, an analysis that "will likely depend on a highly factbound inquiry and may turn on reasonable inferences from the nature and timing of the defendant's change in conduct."

---

[10] Only States and state officers acting in their official capacity are immune from suits for damages in federal court. See, *e. g., Edelman* v. *Jordan*, 415 U. S. 651 (1974). Plaintiffs may bring suit for damages against all others, including municipalities and other political subdivisions of a State, see *Mt. Healthy City Bd. of Ed.* v. *Doyle*, 429 U. S. 274 (1977).

Brief for United States as *Amicus Curiae* 28. Although we do not doubt the ability of district courts to perform the nuanced "three thresholds" test required by the "catalyst theory"—whether the claim was colorable rather than groundless; whether the lawsuit was a substantial rather than an insubstantial cause of the defendant's change in conduct; whether the defendant's change in conduct was motivated by the plaintiff's threat of victory rather than threat of expense, see *post*, at 627–628 (dissenting opinion)—it is clearly not a formula for "ready administrability." *Burlington* v. *Dague*, 505 U. S. 557, 566 (1992).

Given the clear meaning of "prevailing party" in the fee-shifting statutes, we need not determine which way these various policy arguments cut. In *Alyeska*, 421 U. S., at 260, we said that Congress had not "extended any roving authority to the Judiciary to allow counsel fees as costs or otherwise whenever the courts might deem them warranted." To disregard the clear legislative language and the holdings of our prior cases on the basis of such policy arguments would be a similar assumption of a "roving authority." For the reasons stated above, we hold that the "catalyst theory" is not a permissible basis for the award of attorney's fees under the FHAA, 42 U. S. C. § 3613(c)(2), and ADA, 42 U. S. C. § 12205.

The judgment of the Court of Appeals is

*Affirmed.*

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, concurring.

I join the opinion of the Court in its entirety, and write to respond at greater length to the contentions of the dissent.

I

"Prevailing party" is not some newfangled legal term invented for use in late-20th-century fee-shifting statutes.

"[B]y the long established practice and universally recognized rule of the common law, in actions at law, the prevailing party is entitled to recover a judgment for costs . . . ." *Mansfield, C. & L. M. R. Co.* v. *Swan,* 111 U. S. 379, 387 (1884).

> "Costs have usually been allowed to the prevailing party, as incident to the judgment, since the statute 6 Edw. I, c. 1, § 2, and the same rule was acknowledged in the courts of the States, at the time the judicial system of the United States was organized. . . .
>
> "Weighed in the light of these several provisions in the Judiciary Act [of 1789], the conclusion appears to be clear that Congress intended to allow costs to the prevailing party, as incident to the judgment . . . ." *The Baltimore,* 8 Wall. 377, 388, 390 (1869).

The term has been found within the United States Statutes at Large since at least the Bankruptcy Act of 1867, which provided that "[t]he party prevailing in the suit shall be entitled to costs against the adverse party." Act of Mar. 2, 1867, ch. 176, § 24, 14 Stat. 528. See also Act of Mar. 3, 1887, ch. 359, § 15, 24 Stat. 508 ("If the Government of the United States shall put in issue the right of the plaintiff to recover the court may, in its discretion, allow costs to the prevailing party from the time of joining such issue"). A computer search shows that the term "prevailing party" appears at least 70 times in the current United States Code; it is no stranger to the law.

At the time 42 U. S. C. § 1988 was enacted, I know of no case, state or federal, in which—either under a statutory invocation of "prevailing party" or under the common-law rule—the "catalyst theory" was enunciated as the basis for awarding costs. Indeed, the dissent cites only one case in which (although the "catalyst theory" was not expressed)

costs were awarded for a reason that the catalyst theory would support, but today's holding of the Court would not: *Baldwin* v. *Chesapeake & Potomac Tel. Co.*, 156 Md. 552, 557, 144 A. 703, 705 (1929), where costs were awarded because "the granting of [appellee's] motion to dismiss the appeal has made it unnecessary to inquire into the merits of the suit, and the dismissal is based on an act of appellee performed after both the institution of the suit and the entry of the appeal." And that case is irrelevant to the meaning of "prevailing party," because it was a case *in equity.* While, as *Mansfield* observed, costs were awarded in actions *at law* to the "prevailing party," see 111 U. S., at 387, an equity court could award costs "as the equities of the case might require," *Getz* v. *Johnston*, 145 Md. 426, 433, 125 A. 689, 691 (1924). See also *Horn* v. *Bohn*, 96 Md. 8, 12–13, 53 A. 576, 577 (1902) ("The question of costs in equity cases is a matter resting in the sound discretion of the Court, from the exercise of which no appeal will lie" (internal quotation marks and citation omitted)).[1] The other state or state-law cases the dis-

---

[1] The jurisdiction that issued *Baldwin* has used the phrase "prevailing party" frequently (including in equity cases) to mean the party acquiring a judgment. See *Getz* v. *Johnston*, 145 Md. 426, 434, 125 A. 689, 691–692 (1924) (an equity decision noting that "on reversal, following the usual rule, the costs will generally go to the prevailing party, that is, to the appellant" (internal quotation marks and citation omitted)). See also, *e. g.*, *Hoffman* v. *Glock*, 20 Md. App. 284, 293, 315 A. 2d 551, 557 (1974) ("Md. Rule 604a provides: 'Unless otherwise provided by law, or ordered by the court, the prevailing party shall be entitled to the allowance of court costs, which shall be taxed by the clerk and embraced in the judgment'"); *Fritts* v. *Fritts*, 11 Md. App. 195, 197, 273 A. 2d 648, 649 (1971) ("We have viewed the evidence, as we must, in a light most favorable to appellee as the prevailing party below"); *Chillum-Adelphi Volunteer Fire Dept., Inc.* v. *Button & Goode, Inc.*, 242 Md. App. 509, 516, 219 A. 2d 801, 805 (1966) ("At common law, an arbitration award became a cause of action in favor of the prevailing party"); *Burch* v. *Scott*, 1829 WL 1006, *15 (Md. Ct. App., Dec. 1829) ("[T]he demurrer being set down to be argued, the court proceeds to affirm or reverse the decree, and the prevailing party takes the deposite").

sent cites as awarding costs despite the absence of a judgment all involve a judicial finding—or its equivalent, an acknowledgment by the defendant—of the merits of plaintiff's case.[2] Moreover, the dissent cites *not a single case* in

[2] Our decision to award costs in *Mansfield, C. & L. M. R. Co.* v. *Swan,* 111 U. S. 379 (1884), does not "tu[g] against the restrictive rule today's decision installs," *post,* at 630 (GINSBURG, J., dissenting). Defendants had removed the case to federal court, and after losing on the merits, sought to have us vacate the judgment because the basis for removal (diversity of citizenship) was absent. We concluded that because defendants were responsible for the improper removal in the first place, our judgment's "effect [was] to defeat the entire proceeding which they originated and have prosecuted," 111 U. S., at 388. In other words, plaintiffs "prevailed" because defendants' original position as to jurisdiction was defeated. In *Ficklen* v. *Danville,* 146 Va. 426, 438–439, 132 S. E. 705, 706 (1926), appellants were deemed to have "'substantially prevail[ed]'" on their appeal because appellees "abandoned their contention made before the lower court," *i. e.,* "abandoned their intention and desire to rely upon the correctness of the trial court's decree." In *Talmage* v. *Monroe,* 119 P. 526 (Cal. App. 1911), costs were awarded after the defendant complied with an alternative writ of mandamus; it was the writ, not the mere petition, which led to defendant's action.

*Scatcherd* v. *Love,* 166 F. 53 (CA6 1908), *Wagner* v. *Wagner,* 9 Pa. 214 (1848), and other cases cited by the dissent represent a rule adopted in some States that by settling a defendant "acknowledged his liability," *Scatcherd, supra,* at 56; see also *Wagner, supra,* at 215. That rule was hardly uniform among the States. Compare 15 C. J., Costs § 167, p. 89 (1918) (citing cases from 13 States which hold that a "settlement is equivalent to a confession of judgment"), with *id.,* at 89–90, § 168, and n. a (citing cases from 11 States which hold that under a settlement "plaintiff cannot recover costs," because "[c]osts . . . can only follow a judgment or final determination of the action" (internal quotation marks and citation omitted)). I do not think these state cases (and *Scatcherd,* a federal case applying state law) justify expanding the federal meaning of "prevailing party" (based on a "confession of judgment" fiction) to include the party accepting an out-of-court settlement—much less to expand it beyond settlements, to the domain of the "catalyst theory."

The only case cited by the dissent in which the conclusion of acknowledgment of liability was rested on something other than a settlement is *Board of Ed. of Madison Cty.* v. *Fowler,* 192 Ga. 35, 14 S. E. 2d 478 (1941), which, in one of the States that considered settlement an acknowledgment

which this Court—or even any other federal court applying federal law prior to enactment of the fee-shifting statutes at issue here—has regarded as the "prevailing party" a litigant who left the courthouse emptyhanded. If the term means what the dissent contends, that is a remarkable absence of authority.

That a judicial finding of liability was an understood requirement of "prevailing" is confirmed by many statutes that use the phrase in a context that *presumes* the existence of a judicial ruling. See, *e. g.,* 5 U. S. C. § 1221(g)(2) ("[i]f an employee . . . is the prevailing party . . . and the decision is based on a finding of a prohibited personnel practice"); § 1221(g)(3) (providing for an award of attorney's fees to the "prevailing party," "regardless of the basis of the decision"); § 7701(b)(2)(A) (allowing the prevailing party to obtain an interlocutory award of the "relief provided in the decision"); 8 U. S. C. § 1324b(h) (permitting the administrative law judge to award an attorney's fee to the prevailing party "if the losing party's argument is without reasonable foundation in law and fact"); 18 U. S. C. § 1864(e) (1994 ed., Supp. V) (allowing the district court to award the prevailing party its attorney's fee "in addition to monetary damages").

The dissent points out, *post,* at 629, that the Prison Litigation Reform Act of 1995 limits attorney's fees to an amount "proportionately related to the court ordered relief for the violation." This shows that *sometimes* Congress *does* explicitly "tightly bind fees to judgments," *ibid.,* inviting (the dissent believes) the conclusion that "prevailing party" does *not* fasten fees to judgments. That conclusion does not follow from the premise. What this statutory provision demonstrates, *at most,* is that use of the phrase "prevailing party" is not the *only* way to impose a requirement of court-ordered relief. That is assuredly true. But it would be no

---

of liability, analogized compliance with what had been sought by a mandamus suit to a settlement. This is a slim reed upon which to rest the broad conclusion of a catalyst theory.

more rational to reject the normal meaning of "prevailing party" because some statutes produce the same result with different language, than it would be to conclude that, since there are many synonyms for the word "jump," the word "jump" must mean something else.

It is undoubtedly true, as the dissent points out by quoting a nonlegal dictionary, see *post*, at 633–634, that the word "prevailing" can have other meanings in other contexts: "prevailing winds" are the winds that predominate, and the "prevailing party" in an election is the party that wins the election. But when "prevailing party" is used by courts or legislatures in the context of a lawsuit, it is a term of art. It has traditionally—and to my knowledge, prior to enactment of the first of the statutes at issue here, *invariably*— meant the party that wins the suit or obtains a finding (or an admission) of liability. Not the party that ultimately gets his way because his adversary dies before the suit comes to judgment; not the party that gets his way because circumstances so change that a victory on the legal point for the other side turns out to be a practical victory for him; and not the party that gets his way because the other side ceases (for whatever reason) its offensive conduct. If a nuisance suit is mooted because the defendant asphalt plant has gone bankrupt and ceased operations, one would not normally call the plaintiff the prevailing party. And it would make no difference, as far as the propriety of that characterization is concerned, if the plant did not go bankrupt but moved to a new location to avoid the expense of litigation. In one sense the plaintiff would have "prevailed"; but he would not be the prevailing party in the lawsuit. Words that have acquired a specialized meaning in the legal context must be accorded their *legal* meaning.

> "[W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in

the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed. In such case, absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them." *Morissette* v. *United States,* 342 U. S. 246, 263 (1952).

The cases cited by the dissent in which we have "not treated Black's Law Dictionary as preclusively definitive," *post,* at 628–629, are inapposite. In both *Pioneer Investment Services Co.* v. *Brunswick Associates Ltd. Partnership,* 507 U. S. 380 (1993), and *United States* v. *Rodgers,* 466 U. S. 475 (1984), we rejected Black's definition because it conflicted with our precedent. See *Pioneer, supra,* at 395–396, n. 14; *Rodgers, supra,* at 480. We did not, as the dissent would do here, simply reject a relevant definition of a word tailored to judicial settings in favor of a more general definition from another dictionary.

## II

The dissent distorts the term "prevailing party" beyond its normal meaning for policy reasons, but even those seem to me misguided. They rest upon the presumption that the catalyst theory applies when *"the suit's merit* led the defendant to abandon the fray, to switch rather than fight on, to accord plaintiff sooner rather than later the principal redress sought in the complaint," *post,* at 622 (emphasis added). As the dissent would have it, by giving the term its normal meaning the Court today approves the practice of denying attorney's fees to a plaintiff with a proven claim of discrimination, simply because the very *merit* of his claim led the defendant to capitulate before judgment. That is not the case. To the contrary, the Court *approves* the result in *Parham* v. *Southwestern Bell Tel. Co.,* 433 F. 2d 421 (CA8 1970), where attorney's fees were awarded "after [a] finding that the defendant had acted unlawfully," *ante,* at 607–

608, and n. 9.[3]  What the dissent's stretching of the term produces is something more, and something far less reasonable: an award of attorney's fees when the merits of the plaintiff's case remain unresolved—when, for all one knows, the defendant only "abandon[ed] the fray" because the cost of litigation—either financial or in terms of public relations—would be too great.  In such a case, the plaintiff may have "prevailed" as Webster's defines that term—"gain[ed] victory by virtue of strength or superiority," see *post*, at 633.  But I doubt it was greater strength in financial resources, or superiority in media manipulation, rather than *superiority in legal merit*, that Congress intended to reward.

---

[3] The dissent incorrectly characterizes *Parham* as involving undifferentiated "findings or retention of jurisdiction," *post*, at 637, n. 11.  In fact, *Parham* involved a finding that the defendant *had* discriminated, and jurisdiction was retained so that that finding could be given effect, in the form of injunctive relief, should the defendant ever backslide in its voluntary provision of relief to plaintiffs.  Jurisdiction was not retained to determine whether there had been discrimination, and I do not read the Court's opinion as suggesting a fee award would be appropriate in *those* circumstances.

The dissent notes that two other cases were cited in Senate legislative history (*Parham* is cited in legislative history from both the Senate and House) which it claims support the catalyst theory.  If legislative history in general is a risky interpretive tool, legislative history from only one legislative chamber—and consisting of the citation of Court of Appeals cases that surely few if any Members of Congress read—is virtually worthless.  In any event, *Kopet* v. *Esquire Realty Co.*, 523 F. 2d 1005 (CA2 1975), does not support the catalyst theory because the defendant's voluntary compliance was not at issue.  Fees were awarded on the dubious premise that discovery uncovered some documents of potential use in other litigation, making this more a case of an award of interim fees.  *Thomas* v. *Honeybrook Mines*, 428 F. 2d 981 (CA3 1970), is also inapposite.  There, the question was whether counsel for union members, whose fruitless efforts to sue the union had nonetheless spurred the union to sue the employer, should be paid out of a fund established by the union's victory.  Whether the union members were "prevailing parties" in the union suit, or whether they were entitled to attorney's fees as "prevailing parties" in the earlier suit against the union, was not even at issue.

It could be argued, perhaps, that insofar as abstract justice is concerned, there is little to choose between the dissent's outcome and the Court's: If the former sometimes rewards the plaintiff with a phony claim (there is no way of knowing), the latter sometimes denies fees to the plaintiff with a solid case whose adversary slinks away on the eve of judgment. But it seems to me the evil of the former far outweighs the evil of the latter. There is all the difference in the world between a rule that denies the extraordinary boon of attorney's fees to some plaintiffs who are no less "deserving" of them than others who receive them, and a rule that causes the law to be the very instrument of wrong—exacting the payment of attorney's fees to the extortionist.

It is true that monetary settlements and consent decrees can be extorted as well, and we have approved the award of attorney's fees in cases resolved through such mechanisms. See *ante*, at 604 (citing cases). Our decision that the statute makes plaintiff a "prevailing party" under such circumstances was based entirely on language in a House Report, see *Maher* v. *Gagne*, 448 U. S. 122, 129 (1980), and if this issue were to arise for the first time today, I doubt whether I would agree with that result. See *Hewitt* v. *Helms*, 482 U. S. 755, 760 (1987) (SCALIA, J.) (opining that "[r]espect for ordinary language requires that a plaintiff receive at least some relief *on the merits* of his claim before he can be said to prevail" (emphasis added)). But in the case of court-approved settlements and consent decrees, even if there has been no judicial determination of the merits, the outcome is at least the product of, and bears the sanction of, judicial action *in the lawsuit*. There is at least *some* basis for saying that the party favored by the settlement or decree prevailed *in the suit*. Extending the holding of *Maher* to a case in which no judicial action whatever has been taken stretches the term "prevailing party" (and the potential injustice that *Maher* produces) beyond what the normal mean-

ing of that term in the litigation context can conceivably support.

The dissent points out that petitioners' object in bringing their suit was not to obtain "a judge's approbation," but to "stop enforcement of a [West Virginia] rule," *post*, at 634; see also *Hewitt, supra,* at 761. True enough. But not even the dissent claims that if a petitioner accumulated attorney's fees in preparing a threatened complaint, but *never filed it* prior to the defendant's voluntary cessation of its offending behavior, the wannabe-but-never-was plaintiff could recover fees; that would be countertextual, since the fee-shifting statutes require that there be an "action" or "proceeding," see 42 U. S. C. §§ 3613(d), 1988(b) (1994 ed., Supp. V)—which in legal parlance (though not in more general usage) means *a lawsuit*. See *post*, at 643 (concluding that a party should be deemed prevailing as a result of a *"postcomplaint* payment or change in conduct" (emphasis added)). Does that not leave achievement of the broad congressional purpose identified by the dissent just as unsatisfactorily incomplete as the failure to award fees when there is no decree? Just as the dissent rhetorically asks *why* (never mind the language of the statute) Congress would want to award fees when there is a judgment, but deny fees when the defendant capitulates on the eve of judgment; so also it is fair for us to ask *why* Congress would want to award fees when suit has been filed, but deny fees when the about-to-be defendant capitulates under the threat of filing. Surely, it cannot be because determination of whether suit was actually contemplated and threatened is too difficult. All the proof takes is a threatening letter and a batch of timesheets. Surely *that* obstacle would not deter the Congress that (according to the dissent) was willing to let district judges pursue that much more evasive will-o'-the-wisp called "catalyst." (Is this not why we *have* district courts?, asks the dissent, *post*, at 639–640.) My point is not that it would take no more twisting

of language to produce prelitigation attorney's fees than to produce the decreeless attorney's fees that the dissent favors (though that may well be true). My point is that the departure from normal usage that the dissent favors cannot be justified on the ground that it establishes a regime of logical evenhandedness. There *must* be a cutoff of seemingly equivalent entitlements to fees—either the failure to file suit in time or the failure to obtain a judgment in time. The term "prevailing party" suggests the latter rather than the former. One does not prevail in a suit that is never determined.

The dissent's ultimate worry is that today's opinion will "impede access to court for the less well-heeled," *post*, at 623. But, of course, the catalyst theory also harms the "less well-heeled," putting pressure on them to avoid the risk of massive fees by abandoning a solidly defensible case early in litigation. Since the fee-shifting statutes at issue here allow defendants as well as plaintiffs to receive a fee award, we know that Congress did not intend to *maximize* the quantity of "the enforcement of federal law by private attorneys general," *ibid.* Rather, Congress desired an *appropriate* level of enforcement—which is more likely to be produced by limiting fee awards to plaintiffs who prevail "on the merits," or at least to those who achieve an enforceable "alteration of the legal relationship of the parties," than by permitting the open-ended inquiry approved by the dissent.[4]

---

[4] Even the legislative history relied upon by the dissent supports the conclusion that some merit is necessary to justify a fee award. See *post*, at 636, n. 9 (citing a House Report for the proposition that fee-shifting statutes are "'designed to give *[victims of civil rights violation']* access to the judicial process'" (emphasis added)); *ibid.* (citing a Senate Report: "'[I]f those *who violate the Nation's fundamental laws* are not to proceed with impunity,'" fee awards are necessary (emphasis added)). And for the reasons given by the Court, see *ante*, at 605, the catalyst theory's purported "merit test"—the ability to survive a motion to dismiss for failure to state a claim, or the absence of frivolousness—is scant protection for the innocent.

## III

The dissent points out that the catalyst theory has been accepted by "the clear majority of Federal Circuits," *ibid.* But our disagreeing with a "clear majority" of the Circuits is not at all a rare phenomenon. Indeed, our opinions sometimes contradict the *unanimous* and longstanding interpretation of lower federal courts. See, *e. g., McNally* v. *United States,* 483 U. S. 350, 365 (1987) (STEVENS, J., dissenting) (the Court's decision contradicted "[e]very court to consider" the question).

The dissent's insistence that we defer to the "clear majority" of Circuit opinion is particularly peculiar in the present case, since that majority has been nurtured and preserved *by our own misleading dicta* (to which I, unfortunately, contributed). Most of the Court of Appeals cases cited by the dissent, *post,* at 627, and n. 5, as reaffirming the catalyst theory after our decision in *Farrar* v. *Hobby,* 506 U. S. 103 (1992), relied on our earlier opinion in *Hewitt.* See *Marbley* v. *Bane,* 57 F. 3d 224, 234 (CA2 1995) (relying on *Hewitt* to support catalyst theory); *Payne* v. *Board of Ed.,* 88 F. 3d 392, 397 (CA6 1996) (same); *Baumgartner* v. *Harrisburg Housing Auth.,* 21 F. 3d 541, 548 (CA3 1994) (explicitly rejecting *Farrar* in favor of *Hewitt*); *Zinn* v. *Shalala,* 35 F. 3d 273, 274–276 (CA7 1994) (same); *Beard* v. *Teska,* 31 F. 3d 942, 950–952 (CA10 1994) (same); *Morris* v. *West Palm Beach,* 194 F. 3d 1203, 1207 (CA11 1999) (same). Deferring to our colleagues' own error is bad enough; but enshrining the error that we ourselves have improvidently suggested and blaming it on the near-unanimous judgment of our colleagues would surely be unworthy.[5] Informing the Courts of Ap-

---

[5] That a few cases adopting the catalyst theory predate *Hewitt* v. *Helms,* 482 U. S. 755 (1987), see *post,* at 625–626, and n. 4, is irrelevant to my point. Absent our dicta in *Hewitt,* and in light of everything else we have said on this topic, see *ante,* at 603–604, it is unlikely that the catalyst theory would have achieved that universality of acceptance by the Courts of Appeals upon which the dissent relies.

peals that our ill-considered dicta have misled them displays, it seems to me, not "disrespect," but a most becoming (and well-deserved) humility.

\* \* \*

The Court today concludes that a party cannot be deemed to have prevailed, for purposes of fee-shifting statutes such as 42 U. S. C. §§ 1988, 3613(c)(2) (1994 ed. and Supp. V), unless there has been an enforceable "alteration of the legal relationship of the parties." That is the normal meaning of "prevailing party" in litigation, and there is no proper basis for departing from that normal meaning. Congress is free, of course, to revise these provisions—but it is my guess that if it does so it will not create the sort of inequity that the catalyst theory invites, but will require the court to determine that there was at least a substantial likelihood that the party requesting fees would have prevailed.

JUSTICE GINSBURG, with whom JUSTICE STEVENS, JUSTICE SOUTER, and JUSTICE BREYER join, dissenting.

The Court today holds that a plaintiff whose suit prompts the precise relief she seeks does not "prevail," and hence cannot obtain an award of attorney's fees, unless she also secures a court entry memorializing her victory. The entry need not be a judgment on the merits. Nor need there be any finding of wrongdoing. A court-approved settlement will do.

The Court's insistence that there be a document filed in court—a litigated judgment or court-endorsed settlement—upsets long-prevailing Circuit precedent applicable to scores of federal fee-shifting statutes. The decision allows a defendant to escape a statutory obligation to pay a plaintiff's counsel fees, even though the suit's merit led the defendant to abandon the fray, to switch rather than fight on, to accord plaintiff sooner rather than later the principal redress sought in the complaint. Concomitantly, the Court's constricted

definition of "prevailing party," and consequent rejection of the "catalyst theory," impede access to court for the less well heeled, and shrink the incentive Congress created for the enforcement of federal law by private attorneys general.

In my view, the "catalyst rule," as applied by the clear majority of Federal Circuits, is a key component of the fee-shifting statutes Congress adopted to advance enforcement of civil rights. Nothing in history, precedent, or plain English warrants the anemic construction of the term "prevailing party" the Court today imposes.

## I

Petitioner Buckhannon Board and Care Home, Inc. (Buckhannon), operates residential care homes for elderly persons who need assisted living, but not nursing services. Among Buckhannon's residents in October 1996 was 102-year-old Dorsey Pierce. Pierce had resided at Buckhannon for some four years. Her daughter lived nearby, and the care provided at Buckhannon met Pierce's needs. Until 1998, West Virginia had a "self-preservation" rule prohibiting homes like Buckhannon from accommodating persons unable to exit the premises without assistance in the event of a fire. Pierce and two other Buckhannon residents could not get to a fire exit without aid. Informed of these residents' limitations, West Virginia officials proceeded against Buckhannon for noncompliance with the self-preservation rule. On October 18, 1996, three orders issued, each commanding Buckhannon to "cease operating . . . and to effect relocation of [its] existing population within thirty (30) days." App. 46–53.

Ten days later, Buckhannon and Pierce, together with an organization of residential homes and another Buckhannon resident (hereinafter plaintiffs), commenced litigation in Federal District Court to overturn the cease-and-desist orders and the self-preservation rule on which they rested. They sued the State, state agencies, and 18 officials (hereinafter defendants) alleging that the rule discriminated

against persons with disabilities in violation of the Fair Housing Amendments Act of 1988 (FHAA), 42 U. S. C. § 3601 *et seq.*, and the Americans with Disabilities Act of 1990 (ADA), 42 U. S. C. § 12101 *et seq.* Plaintiffs sought an immediate order stopping defendants from closing Buckhannon's facilities, injunctive relief permanently barring enforcement of the self-preservation requirement, damages, and attorney's fees.

On November 1, 1996, at a hearing on plaintiffs' request for a temporary restraining order, defendants agreed to the entry of an interim order allowing Buckhannon to remain open without changing the individual plaintiffs' housing and care. Discovery followed. On January 2, 1998, facing the state defendants' sovereign immunity pleas, plaintiffs stipulated to dismissal of their demands for damages. In February 1998, in response to defendants' motion to dispose of the remainder of the case summarily, the District Court determined that plaintiffs had presented triable claims under the FHAA and ADA.

Less than a month after the District Court found that plaintiffs were entitled to a trial, the West Virginia Legislature repealed the self-preservation rule. Plaintiffs still allege, and seek to prove, that their suit triggered the statutory repeal. After the rule's demise, defendants moved to dismiss the case as moot, and plaintiffs sought attorney's fees as "prevailing parties" under the FHAA, 42 U. S. C. § 3613(c)(2), and the ADA, 42 U. S. C. § 12205.[1]

---

[1] The FHAA provides: "In a civil action . . . , the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee and costs." 42 U. S. C. § 3613(c)(2). Similarly, the ADA provides: "In any action . . . , the court . . . , in its discretion, may allow the prevailing party . . . a reasonable attorney's fee, including litigation expenses, and costs . . . ." 42 U. S. C. § 12205. These ADA and FHAA provisions are modeled on other "prevailing party" statutes, notably the Civil Rights Attorney's Fees Awards Act of 1976, 42 U. S. C. § 1988 (1994 ed. and Supp. V). See H. R. Rep. No. 101–485, pt. 2, p. 140 (1991) (ADA); H. R. Rep. No. 100–711, pp. 16–17, n. 20 (1988) (FHAA). Section 1988 was "patterned upon the

Finding no likelihood that West Virginia would reenact the self-preservation rule, the District Court agreed that the State's action had rendered the case moot. Turning to plaintiffs' application for attorney's fees, the District Court followed Fourth Circuit precedent requiring the denial of fees unless termination of the action was accompanied by a judgment, consent decree, or settlement.[2] Plaintiffs did not appeal the mootness determination, and the Fourth Circuit affirmed the denial of attorney's fees. In sum, plaintiffs were denied fees not because they failed to achieve the relief they sought. On the contrary, they gained the very change they sought through their lawsuit when West Virginia repealed the self-preservation rule that would have stopped Buckhannon from caring for people like Dorsey Pierce.[3]

Prior to 1994, every Federal Court of Appeals (except the Federal Circuit, which had not addressed the issue) concluded that plaintiffs in situations like Buckhannon's and

_____

attorney's fees provisions contained in Titles II and VII of the Civil Rights Act of 1964, 42 U. S. C. §§ 2000a–3(b) and 2000e–5(k), and § 402 of the Voting Rights Act Amendments of 1975, 42 U. S. C. § 1973*l*(e)." *Hensley* v. *Eckerhart*, 461 U. S. 424, 433, n. 7 (1983) (citing *Hanrahan* v. *Hampton*, 446 U. S. 754, 758, n. 4 (1980) *(per curiam))*. In accord with congressional intent, we have interpreted these fee-shifting provisions consistently across statutes. The Court so observes. See *ante*, at 603, n. 4. Notably, the statutes do not mandate fees, but provide for their award "in [the court's] discretion."

[2] On plaintiffs' motion, the District Court sanctioned defendants under Federal Rule of Civil Procedure 11 for failing timely to notify plaintiffs "that the proposed [repeal of the self-preservation rule] was progressing successfully at several stages . . . during the pendency of [the] litigation." App. 144. In their Rule 11 motion, plaintiffs requested fees and costs totaling $62,459 to cover the expense of litigating after defendants became aware, but did not disclose, that elimination of the rule was likely. In the alternative, plaintiffs sought $3,252 to offset fees and expenses incurred in litigating the Rule 11 motion. The District Court, stating that "the primary purpose of Rule 11 is to deter and not to compensate," awarded the smaller sum. App. 147.

[3] Pierce remained a Buckhannon resident until her death on January 3, 1999.

Pierce's could obtain a fee award if their suit acted as a "catalyst" for the change they sought, even if they did not obtain a judgment or consent decree.[4] The Courts of Appeals found it "clear that a party may be considered to have prevailed even when the legal action stops short of final . . . judgment due to . . . intervening mootness." *Grano* v. *Barry*, 783 F. 2d 1104, 1108 (CADC 1986). Interpreting the term "prevailing party" in "a practical sense," *Stewart* v. *Hannon*, 675 F. 2d 846, 851 (CA7 1982) (citation omitted), federal courts across the country held that a party "prevails" for fee-shifting purposes when "its ends are accomplished as a result of the litigation," *Associated Builders & Contractors* v. *Orleans Parish School Bd.*, 919 F. 2d 374, 378 (CA5 1990) (citation and internal quotation marks omitted).

In 1994, the Fourth Circuit en banc, dividing 6-to-5, broke ranks with its sister courts. The court declared that, in light of *Farrar* v. *Hobby*, 506 U. S. 103 (1992), a plaintiff could

---

[4] *Nadeau* v. *Helgemoe*, 581 F. 2d 275, 279–281 (CA1 1978); *Gerena-Valentin* v. *Koch*, 739 F. 2d 755, 758–759 (CA2 1984); *Institutionalized Juveniles* v. *Secretary of Pub. Welfare*, 758 F. 2d 897, 910–917 (CA3 1985); *Bonnes* v. *Long*, 599 F. 2d 1316, 1319 (CA4 1979); *Robinson* v. *Kimbrough*, 652 F. 2d 458, 465–467 (CA5 1981); *Citizens Against Tax Waste* v. *Westerville City School Dist. Bd. of Ed.*, 985 F. 2d 255, 257–258 (CA6 1993); *Stewart* v. *Hannon*, 675 F. 2d 846, 851 (CA7 1982); *Williams* v. *Miller*, 620 F. 2d 199, 202 (CA8 1980); *American Constitutional Party* v. *Munro*, 650 F. 2d 184, 187–188 (CA9 1981); *J & J Anderson, Inc.* v. *Erie*, 767 F. 2d 1469, 1474–1475 (CA10 1985); *Doe* v. *Busbee*, 684 F. 2d 1375, 1379 (CA11 1982); *Grano* v. *Barry*, 783 F. 2d 1104, 1108–1110 (CADC 1986). All *twelve* of these decisions antedate *Hewitt* v. *Helms*, 482 U. S. 755 (1987). But cf. *ante*, at 621, and n. 5 (SCALIA, J., concurring) (maintaining that this Court's decision in *Hewitt* "improvidently suggested" the catalyst rule, and asserting that only "a few cases adopting the catalyst theory predate *Hewitt*"). *Hewitt* said it was "settled law" that when a lawsuit prompts a defendant's "voluntary action . . . that redresses the plaintiff's grievances," the plaintiff "is deemed to have prevailed despite the absence of a formal judgment in his favor." 482 U. S., at 760–761. That statement accurately conveyed the unanimous view then held by the Federal Circuits.

not become a "prevailing party" without "an enforceable judgment, consent decree, or settlement." *S–1 and S–2* v. *State Bd. of Ed. of N. C.*, 21 F. 3d 49, 51 (1994). As the Court today acknowledges, see *ante*, at 603, n. 5, and as we have previously observed, the language on which the Fourth Circuit relied was dictum: *Farrar* "involved no catalytic effect"; the issue plainly "was not presented for this Court's decision in *Farrar.*" *Friends of Earth, Inc.* v. *Laidlaw Environmental Services (TOC), Inc.*, 528 U. S. 167, 194 (2000).

After the Fourth Circuit's en banc ruling, nine Courts of Appeals reaffirmed their own consistently held interpretation of the term "prevail."[5] On this predominant view, "[s]ecuring an enforceable decree or agreement may evidence prevailing party status, but the judgment or agreement simply embodies and enforces what is sought in bringing the lawsuit . . . . Victory can be achieved well short of a final judgment (or its equivalent) . . . . " *Marbley* v. *Bane*, 57 F. 3d 224, 234 (CA2 1995) (Jacobs, J.).

The array of federal-court decisions applying the catalyst rule suggested three conditions necessary to a party's qualification as "prevailing" short of a favorable final judgment or consent decree. A plaintiff first had to show that the defendant provided "some of the benefit sought" by the lawsuit. *Wheeler* v. *Towanda Area School Dist.*, 950 F. 2d 128, 131 (CA3 1991). Under most Circuits' precedents, a plaintiff had to demonstrate as well that the suit stated a genuine claim, *i. e.*, one that was at least "colorable," not "frivolous, unreasonable, or groundless." *Grano*, 783 F. 2d, at 1110 (internal

---

[5] *Stanton* v. *Southern Berkshire Regional School Dist.*, 197 F. 3d 574, 577, n. 2 (CA1 1999); *Marbley* v. *Bane*, 57 F. 3d 224, 234 (CA2 1995); *Baumgartner* v. *Harrisburg Housing Auth.*, 21 F. 3d 541, 546–550 (CA3 1994); *Payne* v. *Board of Ed.*, 88 F. 3d 392, 397 (CA6 1996); *Zinn* v. *Shalala*, 35 F. 3d 273, 276 (CA7 1994); *Little Rock School Dist.* v. *Pulaski Cty. School Dist., #1*, 17 F. 3d 260, 263, n. 2 (CA8 1994); *Kilgour* v. *Pasadena*, 53 F. 3d 1007, 1010 (CA9 1995); *Beard* v. *Teska*, 31 F. 3d 942, 951–952 (CA10 1994); *Morris* v. *West Palm Beach*, 194 F. 3d 1203, 1207 (CA11 1999).

quotation marks and citation omitted). Plaintiff finally had to establish that her suit was a "substantial" or "significant" cause of defendant's action providing relief. *Williams* v. *Leatherbury,* 672 F. 2d 549, 551 (CA5 1982). In some Circuits, to make this causation showing, plaintiff had to satisfy the trial court that the suit achieved results "by threat of victory," not "by dint of nuisance and threat of expense." *Marbley,* 57 F. 3d, at 234–235; see also *Hooper* v. *Demco, Inc.,* 37 F. 3d 287, 293 (CA7 1994) (to render plaintiff "prevailing party," suit "must have prompted the defendant . . . to act or cease its behavior based on the strength of the case, not 'wholly gratuitously'"). One who crossed these three thresholds would be recognized as a "prevailing party" to whom the district court, "in its discretion," *supra,* at 624–625, n. 1, could award attorney's fees.

Developed over decades and in legions of federal-court decisions, the catalyst rule and these implementing standards deserve this Court's respect and approbation.

## II

## A

The Court today detects a "clear meaning" of the term prevailing party, *ante,* at 610, that has heretofore eluded the large majority of courts construing those words. "Prevailing party," today's opinion announces, means "one who has been awarded some relief by the court," *ante,* at 603. The Court derives this "clear meaning" principally from Black's Law Dictionary, which defines a "prevailing party," in critical part, as one "in whose favor a judgment is rendered," *ibid.* (quoting Black's Law Dictionary 1145 (7th ed. 1999)).

One can entirely agree with Black's Law Dictionary that a party "in whose favor a judgment is rendered" prevails, and at the same time resist, as most Courts of Appeals have, any implication that *only* such a party may prevail. In prior cases, we have not treated Black's Law Dictionary as preclu-

sively definitive; instead, we have accorded statutory terms, including legal "term[s] of art," *ante*, at 603 (opinion of the Court); *ante*, at 616 (SCALIA, J., concurring), a contextual reading. See, *e. g.*, *Pioneer Investment Services Co.* v. *Brunswick Associates Ltd. Partnership*, 507 U. S. 380, 395–396, n. 14 (1993) (defining "excusable neglect," as used in Federal Rule of Bankruptcy Procedure 9006(b)(1), more broadly than Black's defines that term); *United States* v. *Rodgers*, 466 U. S. 475, 479–480 (1984) (adopting "natural, nontechnical" definition of word "jurisdiction," as that term is used in 18 U. S. C. § 1001, and declining to confine definition to "narrower, more technical meanings," citing Black's). Notably, this Court did not refer to Black's Law Dictionary in *Maher* v. *Gagne*, 448 U. S. 122 (1980), which held that a consent decree could qualify a plaintiff as "prevailing." The Court explained:

> "The fact that [plaintiff] prevailed through a settlement rather than through litigation does not weaken her claim to fees. Nothing in the language of [42 U. S. C.] § 1988 conditions the District Court's power to award fees on full litigation of the issues or on a judicial determination that the plaintiff's rights have been violated." *Id.*, at 129.

The spare "prevailing party" language of the fee-shifting provision applicable in *Maher*, and the similar wording of the fee-shifting provisions now before the Court, contrast with prescriptions that so tightly bind fees to judgments as to exclude the application of a catalyst concept. The Prison Litigation Reform Act of 1995, for example, directs that fee awards to prisoners under § 1988 be "proportionately related to the *court ordered relief* for the violation." 110 Stat. 1321–72, as amended, 42 U. S. C. § 1997e(d)(1)(B)(i) (1994 ed., Supp. V) (emphasis added). That statute, by its express terms, forecloses an award to a prisoner on a catalyst theory. But the FHAA and ADA fee-shifting prescriptions, modeled

on 42 U. S. C. § 1988 unmodified, see *supra,* at 624–625, n. 1, do not similarly staple fee awards to "court ordered relief." Their very terms do not foreclose a catalyst theory.

## B

It is altogether true, as the concurring opinion points out, *ante,* at 610–611, that litigation costs other than attorney's fees traditionally have been allowed to the "prevailing party," and that a judgment winner ordinarily fits that description.   It is not true, however, that precedent on costs calls for the judgment requirement the Court ironly adopts today for attorney's fees.   Indeed, the first decision cited in the concurring opinion, *Mansfield, C. & L. M. R. Co.* v. *Swan,* 111 U. S. 379 (1884), see *ante,* at 611, tugs against the restrictive rule today's decision installs.

In *Mansfield,* plaintiffs commenced a contract action in state court.   Over plaintiffs' objections, defendants successfully removed the suit to federal court.   Plaintiffs prevailed on the merits there, and defendants obtained review here. See 111 U. S., at 380–381.   This Court determined, on its own motion, that federal subject-matter jurisdiction was absent from the start.   Based on that determination, the Court reversed the lower court's judgment for plaintiffs.   Worse than entering and leaving this Courthouse equally "empty-handed," *ante,* at 614 (concurring opinion), the plaintiffs in *Mansfield* were stripped of the judgment they had won, including the "judicial finding . . . of the merits" in their favor, *ante,* at 613 (concurring opinion).   The *Mansfield* plaintiffs did, however, achieve this small consolation: The Court awarded them costs here as well as below.   Recognizing that defendants had "prevail[ed]" in a "formal and nominal sense," the *Mansfield* Court nonetheless concluded that "[i]n a true and proper sense" defendants were "the losing and not the prevailing party."   111 U. S., at 388.

While *Mansfield* casts doubt on the present majority's "formal and nominal" approach, that decision does not con-

sider whether costs would be in order for the plaintiff who obtains substantial relief, but no final judgment. Nor does *"a single case"* on which the concurring opinion today relies, *ante,* at 613 (emphasis in original).[6] There are, however, enlightening analogies. In multiple instances, state high courts have regarded plaintiffs as prevailing, for costs taxation purposes, when defendants' voluntary conduct, mooting the suit, provided the relief that plaintiffs sought.[7] The con-

---

[6] *The Baltimore,* 8 Wall. 377 (1869), featured in the concurring opinion, see *ante,* at 611, does not run the distance to which that opinion would take it. In *The Baltimore,* there was a judgment in one party's favor. See 8 Wall., at 384. The Court did not address the question whether costs are available absent such a judgment. *The Baltimore's* "incident to the judgment" language, which the concurrence emphasizes, *ante,* at 611 (citing 8 Wall., at 388, 390), likely related to the once-maintained rule that a court without jurisdiction may not award costs. See *Mayor* v. *Cooper,* 6 Wall. 247, 250–251 (1868). That ancient rule figured some years later in *Mansfield, C. & L. M. R. Co.* v. *Swan,* 111 U. S. 379 (1884); the Court noted the "universally recognized rule of the common law" that, absent jurisdiction, a "court can render no judgment for or against either party, [and therefore] cannot render a judgment even for costs." *Id.,* at 387. Receding from that rule, the Court awarded costs, even upon dismissal for lack of jurisdiction, because "there is a judgment or final order in the cause dismissing it for want of jurisdiction." *Ibid.;* see *U. S. Bancorp Mortgage Co.* v. *Bonner Mall Partnership,* 513 U. S. 18, 21 (1994).

[7] See, *e. g., Board of Ed. of Madison Cty.* v. *Fowler,* 192 Ga. 35, 36, 14 S. E. 2d 478, 479 (1941) (mandamus action dismissed as moot, but costs awarded to plaintiffs where "the purposes of the mandamus petition were accomplished by the subsequent acts of the defendants, thus obviating the necessity for further proceeding"); *Baldwin* v. *Chesapeake & Potomac Tel. Co.,* 156 Md. 552, 557, 144 A. 703, 705 (1929) (costs awarded to plaintiff after trial court granted defendant's demurrer and plaintiff's appeal was dismissed "based on an act of [defendant] performed after . . . entry of the appeal"; dismissal rendered "it unnecessary to inquire into the merits of the suit"); *Ficklen* v. *Danville,* 146 Va. 426, 438, 132 S. E. 705, 706 (1926) (costs on appeal awarded to plaintiffs, even though trial court denied injunctive relief and high court dismissed appeal due to mootness, because plaintiffs achieved the "equivalent to . . . 'substantially prevailing'" in "gain[ing] all they sought by the appeal"); cf. *Scatcherd* v. *Love,* 166 F. 53, 55, 56 (CA6 1908) (although "there was no judgment against the defendant

curring opinion labors unconvincingly to distinguish these state-law cases.[8]  A similar federal practice has been observed in cases governed by Federal Rule of Civil Procedure 54(d), the default rule allowing costs "to the prevailing party unless the court otherwise directs."  See 10 C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2667, pp. 187–188 (2d ed. 1983) (When "the defendant alters its conduct so that plaintiff's claim [for injunctive relief] becomes moot before judgment is reached, costs may be allowed [under Rule 54(d)] if the court finds that the changes

---

upon the merits," defendant "acknowledged its liability . . . by paying to the plaintiff the sum of $5,000," rendering plaintiff the "successful party" entitled to costs); *Talmage* v. *Monroe*, 119 P. 526 (Cal. App. 1911) (fees awarded to petitioner after court issued "alternative writ" directing respondent either to take specified action or to show cause for not doing so, and respondent chose to take the action).

[8] The concurrence urges that *Baldwin* is inapposite because it was an action *"in equity,"* and equity courts could award costs as the equities required.  *Ante*, at 612 (emphasis in original).  The catalyst rule becomes relevant, however, only when a party seeks relief of a sort traditionally typed *equitable, i. e.*, a change of conduct, not damages.  There is no such thing as an injunction *at law*, and therefore one cannot expect to find long-ago plaintiffs who quested after that mythical remedy and received voluntary relief.  By the concurrence's reasoning, the paucity of precedent applying the catalyst rule to "prevailing parties" is an artifact of nothing more "remarkable," *ante*, at 614, than the historic law-equity separation.

The concurrence notes that the other cited cases "all involve a judicial finding—*or its equivalent, an acknowledgment by the defendant*—of the merits of plaintiff's case."  *Ante*, at 613 (emphasis added).  I agree.  In *Fowler* and *Scatcherd*, however, the "acknowledgment" consisted of nothing more than the defendant's voluntary provision to the plaintiff of the relief that the plaintiff sought.  See also, *e. g., Jeffersonville R. R. Co.* v. *Weinman*, 39 Ind. 231 (1872) (costs awarded where defendant voluntarily paid damages; no admission or merits judgment); *Wagner* v. *Wagner*, 9 Pa. 214 (1848) (same); *Hudson* v. *Johnson*, 1 Va. 10 (1791) (same).  Common-law courts thus regarded a defendant's voluntary compliance, by settlement or otherwise, as an "acknowledgment . . . of the merits" sufficient to warrant treatment of a plaintiff as prevailing.  But cf. *ante*, at 604, n. 7 (opinion of the Court).  One can only wonder why the concurring opinion would not follow the same practice today.

were the result, at least in part, of plaintiff's litigation.") (citing, *inter alia, Black Hills Alliance* v. *Regional Forester*, 526 F. Supp. 257 (SD 1981)).

In short, there is substantial support, both old and new, federal and state, for a costs award, "in [the court's] discretion," *supra*, at 625, n. 1, to the plaintiff whose suit prompts the defendant to provide the relief plaintiff seeks.

## C

Recognizing that no practice set in stone, statute, rule, or precedent, see *infra*, at 643, dictates the proper construction of modern civil rights fee-shifting prescriptions, I would "assume . . . that Congress intends the words in its enactments to carry 'their ordinary, contemporary, common meaning.'" *Pioneer*, 507 U. S., at 388 (defining "excusable neglect") (quoting *Perrin* v. *United States*, 444 U. S. 37, 42 (1979) (defining "bribery")); see also, *e. g., Sutton* v. *United Air Lines, Inc.*, 527 U. S. 471, 491 (1999) (defining "substantially" in light of ordinary usage); *Rutledge* v. *United States*, 517 U. S. 292, 299–300, n. 10 (1996) (similarly defining "in concert"). In everyday use, "prevail" means "gain victory by virtue of strength or superiority: win mastery: triumph." Webster's Third New International Dictionary 1797 (1976). There are undoubtedly situations in which an individual's goal is to obtain approval of a judge, and in those situations, one cannot "prevail" short of a judge's formal declaration. In a piano competition or a figure skating contest, for example, the person who prevails is the person declared winner by the judges. However, where the ultimate goal is not an arbiter's approval, but a favorable alteration of actual circumstances, a formal declaration is not essential. Western democracies, for instance, "prevailed" in the Cold War even though the Soviet Union never formally surrendered. Among television viewers, John F. Kennedy "prevailed" in the first debate with Richard M. Nixon during the 1960 Presidential contest, even though moderator Howard K. Smith

never declared a winner. See T. White, The Making of the President 1960, pp. 293–294 (1961).

A lawsuit's ultimate purpose is to achieve actual relief from an opponent. Favorable judgment may be instrumental in gaining that relief. Generally, however, "the judicial decree is not the end but the means. At the end of the rainbow lies not a judgment, but some action (or cessation of action) by the defendant . . . ." *Hewitt* v. *Helms,* 482 U. S. 755, 761 (1987). On this common understanding, if a party reaches the "sought-after destination," then the party "prevails" regardless of the "route taken." *Hennigan* v. *Ouachita Parish School Bd.,* 749 F. 2d 1148, 1153 (CA5 1985).

Under a fair reading of the FHAA and ADA provisions in point, I would hold that a party "prevails" in "a true and proper sense," *Mansfield,* 111 U. S., at 388, when she achieves, by instituting litigation, the practical relief sought in her complaint. The Court misreads Congress, as I see it, by insisting that, invariably, relief must be displayed in a judgment, and correspondingly that a defendant's voluntary action never suffices. In this case, Buckhannon's purpose in suing West Virginia officials was not narrowly to obtain a judge's approbation. The plaintiffs' objective was to stop enforcement of a rule requiring Buckhannon to evict residents like centenarian Dorsey Pierce as the price of remaining in business. If Buckhannon achieved that objective on account of the strength of its case, see *supra,* at 628—if it succeeded in keeping its doors open while housing and caring for Ms. Pierce and others similarly situated—then Buckhannon is properly judged a party who prevailed.

## III

As the Courts of Appeals have long recognized, the catalyst rule suitably advances Congress' endeavor to place private actions, in civil rights and other legislatively defined areas, securely within the federal law enforcement arsenal.

The catalyst rule ·stemmed from modern legislation extending civil rights protections and enforcement measures. The Civil Rights Act of 1964 included provisions for fee awards to "prevailing parties" in Title II (public accommodations), 42 U. S. C. § 2000a–3(b), and Title VII (employment), § 2000e–5(k), but not in Title VI (federal programs). The provisions' central purpose was "to promote vigorous enforcement" of the laws by private plaintiffs; although using the two-way term "prevailing party," Congress did not make fees available to plaintiffs and defendants on equal terms. *Christiansburg Garment Co.* v. *EEOC,* 434 U. S. 412, 417, 421 (1978) (under Title VII, prevailing plaintiff qualifies for fee award absent "special circumstances," but prevailing defendant may obtain fee award only if plaintiff's suit is "frivolous, unreasonable, or without foundation").

Once the 1964 Act came into force, courts commenced to award fees regularly under the statutory authorizations, and sometimes without such authorization. See *Alyeska Pipeline Service Co.* v. *Wilderness Society,* 421 U. S. 240, 262, 270–271, n. 46 (1975). In *Alyeska,* this Court reaffirmed the "American Rule" that a court generally may not award attorney's fees without a legislative instruction to do so. See *id.,* at 269. To provide the authorization *Alyeska* required for fee awards under Title VI of the 1964 Civil Rights Act, as well as under Reconstruction Era civil rights legislation, 42 U. S. C. §§ 1981–1983, 1985, 1986 (1994 ed. and Supp. V), and certain other enactments, Congress passed the Civil Rights Attorney's Fees Awards Act of 1976, 42 U. S. C. § 1988 (1994 ed. and Supp. V).

As explained in the Reports supporting § 1988, civil rights statutes vindicate public policies "of the highest priority," S. Rep. No. 94–1011, p. 3 (1976) (quoting *Newman* v. *Piggie Park Enterprises, Inc.,* 390 U. S. 400, 402 (1968) *(per curiam)*), yet "depend heavily upon private enforcement," S. Rep. No. 94–1011, at 2. Persons who bring meritorious civil rights claims, in this light, serve as "private attorneys

general." *Id.*, at 5; H. R. Rep. No. 94–1558, p. 2 (1976). Such suitors, Congress recognized, often "cannot afford legal counsel." *Id.*, at 1. They therefore experience "severe hardshi[p]" under the "American Rule." *Id.*, at 2. Congress enacted § 1988 to ensure that nonaffluent plaintiffs would have "effective access" to the Nation's courts to enforce civil rights laws. *Id.*, at 1.[9] That objective accounts for the fee-shifting provisions before the Court in this case, prescriptions of the FHAA and the ADA modeled on § 1988. See *supra*, at 624–625, n. 1.

Under the catalyst rule that held sway until today, plaintiffs who obtained the relief they sought through suit on genuine claims ordinarily qualified as "prevailing parties," so that courts had discretion to award them their costs and fees. Persons with limited resources were not impelled to "wage total law" in order to assure that their counsel fees would be paid. They could accept relief, in money or of another kind, voluntarily proffered by a defendant who sought to avoid a recorded decree. And they could rely on a judge then to determine, in her equitable discretion, whether counsel fees were warranted and, if so, in what amount.[10]

---

[9] See H. R. Rep. No. 94–1558, at 1 ("Because a vast majority of the victims of civil rights violations cannot afford legal counsel, they are unable to present their cases to the courts. . . . [This statute] is designed to give such persons effective access to the judicial process . . . ."); S. Rep. No. 94–1011, at 2 ("If private citizens are to be able to assert their civil rights, and if those who violate the Nation's fundamental laws are not to proceed with impunity, then citizens must have the opportunity to recover what it costs them to vindicate these rights in court."), quoted in part in *Kay* v. *Ehrler*, 499 U. S. 432, 436, n. 8 (1991). See also *Newman* v. *Piggie Park Enterprises, Inc.*, 390 U. S. 400, 401–402 (1968) *(per curiam)* ("When the Civil Rights Act of 1964 was passed, it was evident that enforcement would prove difficult and that the Nation would have to rely in part upon private litigation as a means of securing broad compliance with the law. . . . [Congress] enacted the provision for counsel fees . . . to encourage individuals injured by racial discrimination to seek judicial relief . . . .").

[10] Given the protection furnished by the catalyst rule, aggrieved individuals were not left to worry, and wrongdoers were not led to believe, that

Congress appears to have envisioned that very prospect. The Senate Report on the 1976 Civil Rights Attorney's Fees Awards Act states: "[F]or purposes of the award of counsel fees, parties may be considered to have prevailed when they vindicate rights through a consent judgment *or without formally obtaining relief.*" S. Rep. No. 94–1011, at 5 (emphasis added). In support, the Report cites cases in which parties recovered fees in the absence of any court-conferred relief.[11]

---

strategic maneuvers by defendants might succeed in averting a fee award. Cf. *ante,* at 608 (opinion of the Court). Apt here is Judge Friendly's observation construing a fee-shifting statute kin to the provisions before us: "Congress clearly did not mean that where [a Freedom of Information Act] suit had gone to trial and developments made it apparent that the judge was about to rule for the plaintiff, the Government could abort any award of attorney fees by an eleventh hour tender of the information." *Vermont Low Income Advocacy Council* v. *Usery,* 546 F. 2d 509, 513 (CA2 1976) (interpreting 5 U. S. C. §552(a)(4)(E), allowing a complainant who "substantially prevails" to earn an attorney's fee); accord, *Cuneo* v. *Rumsfeld,* 553 F. 2d 1360, 1364 (CADC 1977).

[11] See S. Rep. No. 94–1011, at 5 (citing *Kopet* v. *Esquire Realty Co.,* 523 F. 2d 1005, 1008–1009 (CA2 1975) (partner sued his firm for release of documents, firm released the documents, court awarded fees because of the release, even though the partner's claims were "dismissed for lack of subject matter jurisdiction"), and *Thomas* v. *Honeybrook Mines, Inc.,* 428 F. 2d 981, 984, 985 (CA3 1970) (union committee twice commenced suit for pension fund payments, suits prompted recovery, and court awarded fees even though the first suit had been dismissed and the second had not yet been adjudicated)).

The Court features a case cited by the House as well as the Senate in the Reports on § 1988, *Parham* v. *Southwestern Bell Tel. Co.,* 433 F. 2d 421 (CA8 1970). The Court deems *Parham* consistent with its rejection of the catalyst rule, alternately because the Eighth Circuit made a "finding that the defendant had acted unlawfully," and because that court ordered the District Court to "'retain jurisdiction over the matter . . . to insure the continued implementation of the [defendant's] policy of equal employment opportunities.'" *Ante,* at 607, n. 9 (quoting 433 F. 2d, at 429). Congress did not fix on those factors, however: Nothing in either Report suggests that judicial findings or retention of jurisdiction is essential to an award of fees. The courts in *Kopet* and *Thomas* awarded fees based on claims as to which they neither made "a finding" nor "retain[ed] jurisdic-

The House Report corroborates: "[A]fter a complaint is filed, a defendant might voluntarily cease the unlawful practice. *A court should still award fees* even though it might conclude, as a matter of equity, that *no formal relief,* such as an injunction, is needed." H. R. Rep. No. 94–1558, at 7 (emphases added). These Reports, Courts of Appeals have observed, are hardly ambiguous. Compare *ante,* at 607–608 ("legislative history . . . is at best ambiguous"), with, *e. g., Dunn* v. *The Florida Bar,* 889 F. 2d 1010, 1013 (CA11 1989) (legislative history "evinces a clear Congressional intent" to permit award "even when no formal judicial relief is obtained" (internal quotation marks omitted)); *Robinson* v. *Kimbrough,* 652 F. 2d 458, 465 (CA5 1981) (same); *American Constitutional Party* v. *Munro,* 650 F. 2d 184, 187 (CA9 1981) (Senate Report "directs" fee award under catalyst rule). Congress, I am convinced, understood that " '[v]ictory' in a civil rights suit is typically a practical, rather than a strictly legal matter." *Exeter-West Greenwich Regional School Dist.* v. *Pontarelli,* 788 F. 2d 47, 51 (CA1 1986) (citation omitted).

## IV

The Court identifies several "policy arguments" that might warrant rejection of the catalyst rule. See *ante,* at 608–610. A defendant might refrain from altering its conduct, fearing liability for fees as the price of voluntary action. See *ante,* at 608. Moreover, rejection of the catalyst rule has limited impact: Desisting from the challenged conduct will not render a case moot where damages are sought, and even when the plaintiff seeks only equitable relief, a defendant's voluntary cessation of a challenged practice does not render the case moot "unless it is 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.' " *Ante,* at 609 (quoting *Friends of Earth, Inc.,* 528

---

tion." (It nonetheless bears attention that, in line with the Court's description of *Parham,* a plaintiff could qualify as the "prevailing party" based on a finding or retention of jurisdiction.)

U. S., at 189). Because a mootness dismissal is not easily achieved, the defendant may be impelled to settle, negotiating fees less generous than a court might award. See *ante*, at 609. Finally, a catalyst rule would "require analysis of the defendant's subjective motivations," and thus protract the litigation. *Ibid.*

The Court declines to look beneath the surface of these arguments, placing its reliance, instead, on a meaning of "prevailing party" that other jurists would scarcely recognize as plain. See *ante*, at 603. Had the Court inspected the "policy arguments" listed in its opinion, I doubt it would have found them impressive.

In opposition to the argument that defendants will resist change in order to stave off an award of fees, one could urge that the catalyst rule may lead defendants promptly to comply with the law's requirements: the longer the litigation, the larger the fees. Indeed, one who knows noncompliance will be expensive might be encouraged to conform his conduct to the legal requirements before litigation is threatened. Cf. Hylton, Fee Shifting and Incentives to Comply with the Law, 46 Vand. L. Rev. 1069, 1121 (1993) ("fee shifting in favor of prevailing plaintiffs enhances both incentives to comply with legal rules *and* incentives to settle disputes"). No doubt, a mootness dismissal is unlikely when recurrence of the controversy is under the defendant's control. But, as earlier observed, see *supra*, at 636, why should this Court's fee-shifting rulings drive a plaintiff prepared to accept adequate relief, though out-of-court and unrecorded, to litigate on and on? And if the catalyst rule leads defendants to negotiate not only settlement terms but also allied counsel fees, is that not a consummation to applaud, not deplore?

As to the burden on the court, is it not the norm for the judge to whom the case has been assigned to resolve fee disputes (deciding whether an award is in order, and if it is, the amount due), thereby clearing the case from the calendar? If factfinding becomes necessary under the catalyst

rule, is it not the sort that "the district courts, in their fact-finding expertise, deal with on a regular basis"? *Baumgartner* v. *Harrisburg Housing Auth.,* 21 F. 3d 541, 548 (CA3 1994). Might not one conclude overall, as Courts of Appeals have suggested, that the catalyst rule "saves judicial resources," *Paris* v. *Department of Housing and Urban Development,* 988 F. 2d 236, 240 (CA1 1993), by encouraging "plaintiffs to discontinue litigation after receiving through the defendant's acquiescence the remedy initially sought"? *Morris* v. *West Palm Beach,* 194 F. 3d 1203, 1207 (CA11 1999).

The concurring opinion adds another argument against the catalyst rule: That opinion sees the rule as accommodating the "extortionist" who obtains relief because of "greater strength in financial resources, or superiority in media manipulation, rather than *superiority in legal merit." Ante,* at 617, 618 (emphasis in original). This concern overlooks both the character of the rule and the judicial superintendence Congress ordered for all fee allowances. The catalyst rule was auxiliary to fee-shifting statutes whose primary purpose is "to promote the vigorous enforcement" of the civil rights laws. *Christiansburg Garment Co.,* 434 U. S., at 422. To that end, courts deemed the conduct-altering catalyst that counted to be the substance of the case, not merely the plaintiff's atypically superior financial resources, media ties, or political clout. See *supra,* at 628. And Congress assigned responsibility for awarding fees not to automatons unable to recognize extortionists, but to judges expected and instructed to exercise "discretion." See *supra,* at 624–625, n. 1. So viewed, the catalyst rule provided no berth for nuisance suits, see *Hooper,* 37 F. 3d, at 292, or "thinly disguised forms of extortion," *Tyler* v. *Corner Constr. Corp.,* 167 F. 3d 1202, 1206 (CA8 1999) (citation omitted).[12]

---

[12] The concurring opinion notes, correctly, that "[t]here *must* be a cutoff of seemingly equivalent entitlements to fees—either the failure to file suit in time or the failure to obtain a judgment in time." *Ante,* at 620 (empha-

## V

As to our attorney's fee precedents, the Court correctly observes, "[w]e have never had occasion to decide whether the term 'prevailing party' allows an award of fees under the 'catalyst theory,'" and "there is language in our cases supporting both petitioners and respondents." *Ante*, at 603, n. 5. It bears emphasis, however, that in determining whether fee shifting is in order, the Court in the past has placed greatest weight not on any "judicial *imprimatur*," *ante*, at 605, but on the practical impact of the lawsuit.[13] In *Maher* v. *Gagne*, 448 U. S. 122 (1980), in which the Court held fees could be awarded on the basis of a consent decree, the opinion nowhere relied on the presence of a formal judgment. See *supra*, at 629; *infra*, at 642–643, n. 14. Some years

---

sis in original). The former cutoff, the Court has held, is impelled both by "plain language" requiring a legal "action" or "proceeding" antecedent to a fee award, and by "legislative history . . . replete with references to [enforcement] 'in suits,' 'through the courts' and by 'judicial process.'" *North Carolina Dept. of Transp.* v. *Crest Street Community Council, Inc.*, 479 U. S. 6, 12 (1986) (citations omitted). The latter cutoff, requiring "a judgment in time," is not similarly impelled by text or legislative history.

The concurring opinion also states that a prevailing party must obtain relief *"in the lawsuit." Ante*, at 615, 618. One can demur to that elaboration of the statutory text and still adhere to the catalyst rule. Under the rule, plaintiff's suit raising genuine issues must trigger defendant's voluntary action; plaintiff will not prevail under the rule if defendant "ceases . . . [his] offensive conduct" by dying or going bankrupt. See *ante*, at 615. A behavior-altering event like dying or bankruptcy occurs outside the lawsuit; a change precipitated by the lawsuit's claims and demand for relief is an occurrence brought about "through" or "in" the suit.

[13] To qualify for fees in any case, we have held, relief must be real. See *Rhodes* v. *Stewart*, 488 U. S. 1, 4 (1988) *(per curiam)* (a plaintiff who obtains a formal declaratory judgment, but gains no real "relief whatsoever," is not a "prevailing party" eligible for fees); *Hewitt* v. *Helms*, 482 U. S., at 761 (an interlocutory decision reversing a dismissal for failure to state a claim, although stating that plaintiff's rights were violated, does not entitle plaintiff to fees; to "prevail," plaintiff must gain relief of "substance," *i. e.*, more than a favorable "judicial statement that does not affect the relationship between the plaintiff and the defendant").

later, in *Hewitt* v. *Helms*, 482 U. S. 755 (1987), the Court suggested that fees might be awarded the plaintiff who "obtain[ed] relief without [the] benefit of a formal judgment." *Id.*, at 760. The Court explained: "If the defendant, under the pressure of the lawsuit, pays over a money claim before the judicial judgment is pronounced," or "if the defendant, under pressure of [a suit for declaratory judgment], alters his conduct (or threatened conduct) towards the plaintiff," *i. e.*, conduct "that was the basis for the suit, the plaintiff will have prevailed." *Id.*, at 761. I agree, and would apply that analysis to this case.

The Court posits a "'merit' requirement of our prior cases." *Ante*, at 606. *Maher*, however, affirmed an award of attorney's fees based on a consent decree that "did not purport to adjudicate [plaintiff's] statutory or constitutional claims." 448 U. S., at 126, n. 8. The decree in *Maher* "explicitly stated that 'nothing [therein was] intended to constitute an admission of fault by either party.'" *Ibid.* The catalyst rule, in short, conflicts with none of "our prior *holdings*," *ante*, at 605.[14]

---

[14] The Court repeatedly quotes passages from *Hanrahan* v. *Hampton*, 446 U. S., at 757–758, stating that to "prevail," plaintiffs must receive relief "on the merits." *Ante*, at 603, 604, 608. Nothing in *Hanrahan*, however, declares that relief "on the merits" requires a "judicial *imprimatur.*" *Ante*, at 605. As the Court acknowledges, *Hanrahan* concerned an interim award of fees, after plaintiff succeeded in obtaining nothing more than reversal of a directed verdict. See *ante*, at 605. At that juncture, plaintiff had obtained no change in defendant's behavior, and the suit's ultimate winner remained undetermined. There is simply no inconsistency between *Hanrahan*, denying fees when a plaintiff might yet obtain no real benefit, and the catalyst rule, allowing fees when a plaintiff obtains the practical result she sought in suing. Indeed, the harmony between the catalyst rule and *Hanrahan* is suggested by *Hanrahan* itself; like *Maher* v. *Gagne*, 448 U. S. 122, 129 (1980), *Hanrahan* quoted the Senate Report recognizing that parties may prevail "through a consent judgment *or* without formally obtaining relief." 446 U. S., at 757 (quoting S. Rep. No. 94–1011, at 5) (emphasis added). *Hanrahan* also selected for citation

\*     \*     \*

The Court states that the term "prevailing party" in fee-shifting statutes has an "accepted meaning." *Ante,* at 608. If that is so, the "accepted meaning" is not the one the Court today announces. It is, instead, the meaning accepted by every Court of Appeals to address the catalyst issue before our 1987 decision in *Hewitt,* see *supra,* at 626, n. 4, and disavowed since then only by the Fourth Circuit, see *supra,* at 627, n. 5. A plaintiff prevails, federal judges have overwhelmingly agreed, when a litigated judgment, consent decree, out-of-court settlement, or the defendant's voluntary, postcomplaint payment or change in conduct in fact affords redress for the plaintiff's substantial grievances.

When this Court rejects the considered judgment prevailing in the Circuits, respect for our colleagues demands a co-

the influential elaboration of the catalyst rule in *Nadeau* v. *Helgemoe,* 581 F. 2d, at 279–281. See 446 U. S., at 757.

The Court additionally cites *Texas State Teachers Assn.* v. *Garland Independent School Dist.,* 489 U. S. 782 (1989), which held, unanimously, that a plaintiff could become a "prevailing party" without obtaining relief on the "central issue in the suit." *Id.,* at 790. *Texas State Teachers* linked fee awards to a "material alteration of the legal relationship of the parties," *id.,* at 792–793, but did not say, as the Court does today, that the change must be "court-ordered," *ante,* at 604. The parties' legal relationship does change when the defendant stops engaging in the conduct that furnishes the basis for plaintiff's civil action, and that action, which both parties would otherwise have litigated, is dismissed.

The decision with language most unfavorable to the catalyst rule, *Farrar* v. *Hobby,* 506 U. S. 103 (1992), does not figure prominently in the Court's opinion—and for good reason, for *Farrar* "involved no catalytic effect." See *ante,* at 603, n. 5 (quoting *Friends of Earth, Inc.* v. *Laidlaw Environmental Services (TOC), Inc.,* 528 U. S. 167, 194 (2000) (internal quotation marks omitted)); *supra,* at 627. *Farrar* held that a plaintiff who sought damages of $17 million, but received damages of $1, was a "prevailing party" nonetheless not entitled to fees. 506 U. S., at 113–116. In reinforcing the link between the right to a fee award and the "degree of success obtained," *id.,* at 114 (quoting *Hensley* v. *Eckerhart,* 461 U. S., at 436), *Farrar's holding* is consistent with the catalyst rule.

gent explanation. Today's decision does not provide one. The Court's narrow construction of the words "prevailing party" is unsupported by precedent and unaided by history or logic. Congress prescribed fee-shifting provisions like those included in the FHAA and ADA to encourage private enforcement of laws designed to advance civil rights. Fidelity to that purpose calls for court-awarded fees when a private party's lawsuit, whether or not its settlement is registered in court, vindicates rights Congress sought to secure. I would so hold and therefore dissent from the judgment and opinion of the Court.