[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 6, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-12296

_____

D. C. Docket No. 81-00155-CV-2

JOHN P. ROWE, JR.,
HORACE MCDUFFIE,
TERRY A. RICHMOND,
MITCHELL S. BRODY,
KENNETH H. BASS,

Plaintiffs-Appellees,

JAMES RIVERS,

Plaintiff,

versus

THOMAS F. "SLICK" JONES,
MANSY CLARK,
RONALD E. DEMPSEY,
ALTON L. WOOTEN,
WAYNE HUTCHESON,
JOHN M. MCCLURD,
HAROLD PATE,
WILLOU COPELAND SMITH,
RONALD E. YOUNG,

Defendants-Appellants,

BEN F. AVERA, et al.,

Defendants.

_____

Appeal from the United States District Court
for the Southern District of Georgia
_____

**(April 6, 2007)**

Before HULL and MARCUS, Circuit Judges, and BARZILAY,[*] Judge.

PER CURIAM:

Defendants appeal the district court's dismissal of their motion to terminate a permanent plan for charitable donations from an Inmate Welfare Fund. This fund was created following the settlement of a 42 U.S.C. § 1983 class action lawsuit filed on behalf of inmates in the Glynn County Detention Center ("GCDC"). The question here is whether the plan should be terminated pursuant to the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626. After review and oral argument, we reverse the district court's order dismissing the motion to terminate.

## I. BACKGROUND

On December 17, 1981, John P. Rowe, Jr. and three other individuals filed a

[*]Honorable Judith M. Barzilay, Judge, United States Court of International Trade, sitting by designation.

§ 1983 class action suit on behalf of themselves and fellow inmates in the GCDC, alleging unconstitutional conditions of confinement.[1]  Following class certification, the plaintiff-class of inmates ("the inmates") entered a settlement agreement with defendants, which included then-Glynn County Sheriff Thomas F. "Slick" Jones, two GCDC administrators, and the Glynn County Board of Commissioners ("Glynn County Defendants").  The district court approved the settlement agreement and incorporated it into a "Consent Order" entered on December 20, 1982.

In 1985, the inmates filed a petition for contempt seeking judicial enforcement of the "Consent Order."  On December 4, 1985, both parties entered a "Stipulation" that dismissed the inmates' petition for contempt and provided, inter alia, for the creation of the Inmate Welfare Fund ("the Fund").  The "Stipulation" stated that the Fund "shall be used to generally promote the welfare of the inmate population and may be used to defray the cost of items furnished to the indigent inmates" using the profits from the GCDC's commissary and pay telephones.  Attorneys for both parties and the district court judge signed the stipulation.

_____

[1]The complaint alleged, inter alia, that (1) the GCDC had inadequate and overcrowded facilities; (2) the inmates lacked adequate health care with no onsite medical supplies or trained personnel for medical emergencies; (3) there were no counseling, educational, or vocational programs at the facility; (4) the GCDC sanctioned harsh discipline of inmates, including lengthy periods in solitary confinement and physical abuse by guards; and (5) the inmates were denied access to reading materials, all in violation of the First, Eighth, and Fourteenth Amendments.

By 1993, the Fund had accumulated a large surplus. Current Glynn County Sheriff Wayne Bennett filed a motion to donate the excess funds to charity. The district court granted the motion and authorized Sheriff Bennett to donate the surplus to local charities on behalf of the inmates. In April 1994, the inmates filed a motion for a permanent plan to make annual donations from the Fund to local charities. Over the Glynn County Defendants' objection, the district court granted the inmates' motion. On August 3, 1994, the district court issued an "Order" that established a permanent plan that (1) created an independently administered charitable trust and (2) ordered the sheriff to send the Fund surplus on the 10th of each month to that trust, from which annual donations would be made to local charities. The "Order" stated that "this Court shall retain jurisdiction of this matter such that the trust shall remain under the supervision of this Court." None of the defendants or their counsel signed the court order or the attached trust agreement, which was expressly incorporated into the court order.

In June 1998, the Glynn County Defendants filed a motion to terminate the 1982 "Consent Order," pursuant to the termination provisions of the PLRA. See 18 U.S.C. § 3626(b)(1)(A)(iii), (b)(2). The inmates did not oppose the motion and agreed that "past constitution[al] violations have been redressed, and no ongoing or

4

current constitutional violations exist in the [GCDC]."[2] Accordingly, the district court entered a "Final Order" on September 22, 1998, that stated, "the Court finds that the discrimination addressed by this litigation has been corrected and the PLRA requires immediate termination of the Consent Order." However, the district court also noted that its 1994 "Order" promulgated a permanent plan establishing a charitable trust and found that this charitable trust should continue, stating that "its Order of August 3, 1994 should remain in full force and effect pending further Order of this Court." The district court vacated all of its previous orders in this case except the 1994 "Order" and ended all prospective relief. The district court judge signed the 1998 "Final Order," and attorneys for both parties signed beneath the "Consented To:" notation.

In November 2005, the Glynn County Defendants filed a motion to terminate the permanent plan. The district court held an evidentiary hearing on the motion in February 2006, during which Sheriff Bennett testified that the funds should be spent on the GCDC itself due to the substantial administrative costs incurred in operating the commissary.[3] On March 15, 2006, the district court

---

[2]Neither the Glynn County Defendants nor the inmates sought a continuation of the permanent plan for charitable donations from the trust in their motions. In fact, the inmates agreed with the Glynn County Defendants that "the Orders of this Court dealing with the operation of the [GCDC] should be terminated."

[3]The Glynn County Defendants disputed whether a large Fund surplus existed at all. They claimed that the commissary had annual operational costs exceeding $51,000, an amount

5

dismissed the motion to terminate the permanent plan. The district court found that the 1998 "Final Order" preserving the permanent plan was a private settlement agreement, not a consent decree subject to the PLRA's termination provisions. Specifically, the district court determined that "[w]hile the trust was created by court order, it was continued and ratified in 1998 as a result of a private agreement to settle the case." Accordingly, the district court concluded that it had no authority to terminate or modify the private settlement agreement.

The Glynn County Defendants timely appealed.

## II. DISCUSSION

The Glynn County Defendants contend that the orders creating the charitable trust and continuing the charitable trust were prospective relief that must be terminated under the PLRA. We first review the relevant statutory provisions of the PLRA before considering the orders at issue in this case.[4]

In 1996, Congress enacted the PLRA, which limits the scope of prospective

---

nearly equal to the $55,000 provided to the charitable trust from the Fund each year.

[4]The inmates contend that the issue of whether the Fund and the permanent plan for charitable donations were established by private settlement agreements is a question of fact that should be reviewed for clear error. See Peebles v. Merrill Lynch, Pierce, Fenner & Smith Inc., 431 F.3d 1320, 1324 (11th Cir. 2005). However, neither party contests any factual issue associated with these orders. Instead, the question of whether these orders should be considered consent decrees or private settlement agreements hinges squarely on the interpretation of the PLRA. Because the interpretation of a federal statute is a question of law, we review the district court's dismissal of the motion to terminate de novo. See CP v. Leon County Sch. Bd. Fla., 466 F.3d 1318, 1323 (11th Cir. 2006).

6

relief that courts may grant in cases challenging prison conditions. See Cason v. Seckinger, 231 F.3d 777, 779-80 (11th Cir. 2000). Under the PLRA, prospective relief with respect to prison conditions "shall extend no further than necessary to correct the violation of the Federal right . . . ." 18 U.S.C. § 3626(a)(1)(A). Moreover, the PLRA limits a court's authority to continue to enforce existing prospective relief entered before the enactment of the PLRA. Cason, 231 F.3d at 780. Upon motion by any party, prospective relief entered on or before the date of the PLRA's enactment is terminated two years after the date of enactment. 18 U.S.C. § 3626(b)(1)(A)(iii). A defendant or intervener is also entitled to immediate termination of prospective relief in the absence of a court finding that "the relief is narrowly drawn, extends no further than necessary to correct the violation . . ., and is the least intrusive means necessary to correct the violation . . . ." Id. § 3626(b)(2). These termination provisions do not apply and prospective relief remains in force, however, if the relief remains "necessary to correct a current and ongoing violation of the Federal right" and otherwise satisfies the restrictions in 18 U.S.C. § 3626(a)(1)(A). Id. § 3626(b)(3).

The application of these termination provisions hinges on the nature of the prospective relief. The PLRA defines "relief" as "all relief in any form that may be granted or approved by the court, and includes consent decrees but does not

7

include private settlement agreements," and "prospective relief" includes "all relief other than compensatory monetary damages." Id. § 3626(g)(9), (g)(7). While consent decrees are subject to the PLRA's restrictions on prospective relief, id. § 3626(c)(1), the PLRA shields private settlement agreements from these restrictions, id. § 3626(c)(2)(A). Section 3626(c)(2)(A) states, "[n]othing in this section shall preclude parties from entering into a private settlement agreement that does not comply with the limitations on relief . . ., if the terms of that agreement are not subject to court enforcement other than the reinstatement of the civil proceeding that the agreement settled."[5] Id.

Neither party disputes that the PLRA's termination provisions are applicable to consent decrees but not to private settlement agreements. Moreover, neither party disputes that no "current and ongoing" federal law violations exist that would justify continued enforcement of prospective relief. Id. § 3626(b)(3). The sole issue is whether the orders creating the charitable trust and requiring surplus payments from the Fund to that trust were consent decrees or private settlement agreements.

In order to parse the distinction between consent decrees and private

---

[5]Moreover, the PLRA states that nothing prevents a party from seeking a state law remedy in state court for an alleged breach of a private settlement agreement. Id. § 3626(c)(2)(B).

8

settlement agreements in the PLRA, we turn first to the plain language of the statute. See Wachovia Bank, N.A. v. United States, 455 F.3d 1261, 1267-68 (11th Cir. 2006); see also FMC Corp. v. Holliday, 498 U.S. 52, 57, 111 S. Ct. 403, 407 (1990) (noting that courts generally assume that the ordinary meaning of statutory language accurately expresses Congress's legislative purpose). The PLRA defines a "private settlement agreement" as "an agreement entered into among the parties that is not subject to judicial enforcement other than the reinstatement of the civil proceeding that the agreement settled." Id. § 3626(g)(6). A "consent decree" is defined as any other relief "entered by the court that is based in whole or in part upon the consent or acquiescence of the parties but does not include private settlements." Id. § 3626(g)(1). Therefore, both consent decrees and private settlement agreements are based at least in part on an agreement between parties.

However, it is clear that Congress sought to distinguish these two terms given the explicit definition that consent decrees "do[] not include private settlements." Id.; see also Benjamin v. Jacobson, 172 F.3d 144, 157 (2d Cir. 1999) (en banc) ("Given these definitions, it appears that Congress sought to make the [PLRA]'s concepts of consent decrees and private settlement agreements mutually exclusive."). Private settlement agreements are "not subject to judicial enforcement," 18 U.S.C. § 3626(g)(6), and the private settlement agreement

9

exemption from the PLRA's restrictions applies "if the terms of [an] agreement are not subject to court enforcement other than the reinstatement of the civil proceeding that the agreement settled," id. § 3626(c)(2)(A) (emphasis added).  In contrast, consent decrees are "entered by the court," id. § 3626(g)(1), and the PLRA directs courts to comply with its restrictions on prospective relief before "enter[ing] or approv[ing]" consent decrees, id. § 3626(c)(1).  Based on the plain language of the PLRA, judicial enforcement is thus the critical distinction between private settlement agreements and consent decrees.[6]

Even assuming that this statutory language was not clear, the PLRA's legislative history comports with this plain meaning.  See United States v. Williams, 425 F.3d 987, 988-89 (11th Cir. 2005) (noting that courts may look to the legislative history if the statutory language is ambiguous).  The congressional committee report of a predecessor bill, which contained nearly identical termination provisions to the PLRA's provisions, stated that the restriction on

---

[6]The common understanding of consent decrees and private settlement agreements in other contexts supports this distinction.  In considering an award for attorney's fees, we have noted that "'[p]rivate settlements do not entail the judicial approval and oversight involved in consent decrees. And federal jurisdiction to enforce a private contractual settlement will often be lacking unless the terms of the agreement are incorporated into the order of dismissal.'"  Am. Disability Ass'n, Inc. v. Chmielarz, 289 F.3d 1315, 1319 (11th Cir. 2002) (quoting Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res., 532 U.S. 598, 604 n.7, 121 S. Ct. 1835, 1840 n.7 (2001)); see also Smalbein ex rel. Estate of Smalbein v. City of Daytona Beach, 353 F.3d 901, 905-07 (11th Cir. 2003) (stating that when a court retains jurisdiction to enforce a settlement agreement, the agreement functions as a consent decree).

prospective relief "limits the use of court-enforced consent decrees to resolve prison conditions suits, while freely allowing the use of private settlement agreements. Parties may continue to enter such agreements to avoid lengthy and burdensome litigation, but they cannot expect to rely on the court to enforce the agreement." H.R. Rep. No. 104-21, at 24-25 (1995); see also Benjamin, 172 F.3d at 158 (interpreting the PLRA's legislative history). Accordingly, the legislative history makes it plain that Congress intended to distinguish consent decrees, which are judicially enforced agreements, from private settlement agreements, which are not judicially enforced.

The presence of judicial enforcement affects the remedies that parties can seek for a breach of an agreement's terms. Under the PLRA, the only remedies for a breach of a private settlement agreement are "the reinstatement of the civil proceeding that the agreement settled" or a state law claim. 18 U.S.C. § 3626(c)(2)(A), (c)(2)(B); see also United States v. City of Miami, 664 F.2d 435, 439 (Former 5th Cir. Dec. 1981) (en banc) ("If the parties agree to compose their differences by a settlement agreement, . . . the only penalty for failure to abide by the agreement is another suit.").[7] In contrast, because consent decrees are entered by the court and are judicially enforceable, they function like any other court order

_____

[7]This Court adopted as binding precedent all decisions of the full en banc court of the former Fifth Circuit. Stein v. Reynolds Sec., Inc., 667 F.2d 33, 34 (11th Cir. 1982).

11

or judgment and thus "may be enforced by judicial sanctions, including citation for contempt if [they are] violated." City of Miami, 664 F.2d at 440; see also Hazen ex rel. LeGear v. Reagen, 208 F.3d 697, 699 (8th Cir. 2000) (interpreting the PLRA and distinguishing consent decrees "enforceable through the supervising court's exercise of its contempt powers" from private settlement agreements "enforceable only through a new action for breach of contract"); Benjamin, 172 F.3d at 157 (same).

With these distinctions in mind, we turn to the orders in this case. First, the inmates contend that the 1985 "Stipulation" that created the Fund must be a private settlement agreement because the Fund was not the type of relief that the district court could have ordered to correct federal rights violations. If the Fund were not necessary to remedy a federal rights violation, the inmates assert that the Fund falls outside of the PLRA's provisions and thus must be treated as a private settlement agreement.

However, this argument bears only on the validity of the Fund as "narrowly drawn" prospective relief under 18 U.S.C. § 3626(a)(1)(A), which is not at issue on appeal. Questioning the validity of the Fund as a form of prospective relief is irrelevant as to whether the "Stipulation" itself constitutes a private settlement agreement or a consent decree. Most importantly, as the Glynn County Defendants

12

argue, the district court vacated the 1985 "Stipulation" and declared it of no prospective effect in its 1998 "Final Order." As a result, we do not need to determine whether the 1985 "Stipulation" is a private settlement agreement because the "Stipulation" is no longer in effect and thus cannot support the continued existence of the charitable trust.[8]

The 1994 "Order" establishing a permanent plan that created the charitable trust and required surplus payments from the Fund to that trust was a court order, not a private settlement agreement. As the district court noted in its 2006 order, the Glynn County Defendants "have asserted that they never agreed to the operation of the charitable trust, and the record indicates that Defendants did oppose its creation in 1994." Moreover, the Glynn County Defendants never signed the 1994 "Order" or otherwise indicated their consent in 1994 to the creation of the charitable trust or to the requirement that the sheriff pay the Fund surplus to that trust. The 1994 "Order" also specifically stated that "this Court shall retain jurisdiction of this matter such that the trust shall remain under the

---

[8]We note, however, that the parties treated the 1985 "Stipulation" as a judicially enforceable consent decree. As noted above, if this agreement were a private settlement agreement, the district court would not have had jurisdiction to modify the Fund because the "Stipulation" would not have been a judicially enforceable agreement. However, Sheriff Bennett sought the district court's approval for a one-time charitable donation from the Fund's surplus in 1993, and the inmates filed a motion for a permanent plan for charitable donations from the Fund, which the district court subsequently granted, in 1994.

supervision of this Court." Because neither the charitable trust nor the Fund payment requirement were products of an agreement between parties and the district court retained jurisdiction to enforce its order, the 1994 "Order" cannot be considered a private settlement agreement. See 18 U.S.C. § 3626(g)(6).

Although the Glynn County Defendants did not consent to the initial creation of the charitable trust or the Fund payment requirement to that trust in 1994, the district court found that "[w]hile the trust was created by court order, it was continued and ratified in 1998 as a result of a private agreement to settle the case." The district court noted that the Glynn County Defendants signed the 1998 "Final Order" under the "Consented to:" notation, thus indicating their consent to the continuation of the charitable trust. Under this reasoning, the Glynn County Defendants' initial opposition would be immaterial because all parties later agreed to continue the charitable trust and surplus Fund payments thereto in a private settlement agreement.

A closer examination of the district court's 1998 "Final Order" refutes this argument, however. First, the Glynn County Defendants note that the 1998 "Final Order," on its surface, bears all the hallmarks of a consent decree. The 1998 order is itself entitled "Final Order," and the district judge signed the "Final Order" under the notation "So Ordered." Instead of noting that the parties agreed to

14

continue the charitable trust and surplus Fund payments thereto, the "Final Order" states that "[t]he Court finds that the Inmate Welfare Trust should continue and that its Order of August 3, 1994 should remain in full force and effect pending further Order of this Court." (Emphasis added). Accordingly, the 1998 "Final Order" literally bears the signature and sanction of the district court, distinguishing the order from private settlement agreements, which do not carry this stamp of judicial action. Cf. Smalbein ex rel. Estate of Smalbein v. City of Daytona Beach, 353 F.3d 901, 907 (11th Cir. 2003) ("[I]n the case of court-approved settlements and consent decrees, even if there has been no judicial determination of the merits, the outcome is at least the product of, and bears the sanction of, judicial action in the lawsuit." (quotation marks and citation omitted)).

Second, the 1998 "Final Order" also figuratively bears the imprimatur of the district court because the district court retained jurisdiction over the enforcement of the charitable trust. As noted above, in the 1994 "Order," the district court stated that it retained jurisdiction of this matter and supervision of the charitable trust. In turn, the 1998 "Final Order" states that the 1994 "Order" shall remain "in full force and effect." Therefore, even after the 1998 order, the district court retained jurisdiction over the charitable trust.

Moreover, the 1998 "Final Order" itself states that the charitable trust and

15

the 1994 "Order," establishing the trust and requiring surplus Fund payments thereto, should continue "pending further Order of this Court." Accordingly, the district court retained jurisdiction both (1) indirectly by stating that the 1994 "Order," including the judicial enforcement provision, remains in "full force and effect"; and (2) directly by reserving the power to vacate the 1994 "Order" in a "further Order of this Court." Because private settlement agreements are "not subject to judicial enforcement," only the parties bound by a settlement agreement can discontinue it, not a district court. 18 U.S.C. § 3626(g)(6). By reserving judicial authority to discontinue the charitable trust in a "further Order of this Court," the 1998 "Final Order" indicates that the charitable trust is subject to judicial enforcement and thus is not the product of a private settlement agreement.

Instead, the 1998 "Final Order" should be treated as a consent decree. The Glynn County Defendants do not dispute that they consented in the 1998 "Final Order" to allow the 1994 "Order" to remain in effect. Contrary to the district court's determination in its 2006 "Order," the 1998 "Final Order" bears the stamp of judicial enforcement in both the language of the order and the retention of jurisdiction over the charitable trust.[9] Because the 1998 "Final Order" was "based in whole or in part upon the consent or acquiescence of the parties," but the district

---

[9]Furthermore, in its 2006 "Order" dismissing defendants' motion to terminate the charitable trust, the district court itself refers to the 1998 "Final Order" as a "consent order."

16

court retained jurisdiction to enforce the parties' agreement, the 1998 "Final Order" functions as a consent decree under the PLRA. 18 U.S.C. § 3626(g)(1), (g)(6).

If we treat the 1998 "Final Order" continuing the permanent plan as a consent decree, the charitable trust and required Fund payments to that trust must be terminated under the PLRA. As discussed above, the PLRA's termination provisions apply to consent decrees, as they do to all other forms of prospective relief. 18 U.S.C. § 3626(b)(1)(A)(iii), (b)(2); see also Benjamin, 172 F.3d at 156; Inmates of Suffolk County Jail v. Rouse, 129 F.3d 649, 655 (1st Cir. 1997). Under these provisions, defendants are entitled to immediate termination of the consent decree in the absence of a court finding that "the relief is narrowly drawn, extends no further than necessary to correct the violation . . ., and is the least intrusive means necessary to correct the violation . . . ." 18 U.S.C. § 3626(b)(2). There is no dispute here that no such court finding was made supporting the consent decree.

This consent decree also exceeds the durational limits of the PLRA's termination provision because it has been in force for more than two years. See 18 U.S.C. § 3626(b)(1)(A). Although the PLRA states that the consent decree should not be terminated if such relief "remains necessary to correct a current and ongoing violation of the Federal right," both parties and the court have agreed that no

17

current and ongoing violations exist.  18 U.S.C. § 3626(b)(3).  Accordingly, we conclude that both the initial 1994 court order establishing the charitable trust and requiring Fund payments to that trust and the 1998 consent decree continuing the charitable trust are terminable under the PLRA.[10]

## III. CONCLUSION

For the foregoing reasons, we reverse the district court's order dismissing the Glynn County Defendants' motion to terminate the permanent plan establishing the charitable trust and requiring Fund payments to that trust.  On remand, the district court shall grant the motion to terminate the plan.

**REVERSED AND REMANDED WITH INSTRUCTIONS.**

---

[10]The Glynn County Defendants also contend that the district court erred in denying their motion to terminate the charitable trust because the permanent plan for charitable donations violates the gratuities clause of the Georgia Constitution.  See Ga. Const. art. 3, § 6, ¶6.  Because we conclude that the charitable trust is terminable under the PLRA, we do not need to address this state law issue.