OPINION OF THE COURT
Mazzarelli, J.E
Eleven years ago, in Matter of Auguste v Hammons (285 AD2d 417 [1st Dept 2001]), this Court held that when a person commences an action or proceeding against the State, and the State moots the action by voluntarily granting the relief sought, the State Equal Access to Justice Act (State EAJA) (CPLR 8600 et seq.) does not entitle the person to recover attorneys’ fees under the theory that the lawsuit was the “catalyst” for the favorable state action. The holding was wholly based on Buckhannon Board & Care Home, Inc. v West Virginia Dept. of Health & Human Resources (532 US 598 [2001]), which was decided by the *82 United States Supreme Court after Auguste had been argued to this Court. In Buckhannon, the Court was not interpreting the State EAJA, or even its federal counterpart, the Federal Equal Access to Justice Act (Federal EAJA) (28 USC § 2412 [d])Rather, it was reviewing fee-shifting provisions in two antidiscrimination statutes, and it held that an award of attorneys’ fees may not be made under the “catalyst theory,” because for a party to be considered a “prevailing party” the recovery must have been judicially sanctioned. This holding upended decisions of virtually all of the federal circuit courts, which had long applied the catalyst theory in awarding attorneys’ fees.
Because Auguste was briefed and argued to this Court before Buckhannon was decided, the parties assumed that the catalyst theory applied to the State EAJA. As a result, and as suggested by the lack of discussion of the issue in our short memorandum decision, it appears that this Court was not focused on the qualitative differences between the two statutes. Relying on the fact that the State EAJA was explicitly intended to be “similar” to the Federal EAJA (CPLR 8600), this Court strictly applied the Buckhannon holding. Since Auguste was decided, this Court has only had occasion to cite it once, in Matter of Wittlinger v Wing (289 AD2d 171 [1st Dept 2001], affd 99 NY2d 425 [2003]). However, in Wittlinger, unlike in the instant case, this Court also found that the State’s position was substantially justified, so an award of attorneys’ fees would have been denied regardless. Notably, in affirming Wittlinger, the Court of Appeals, although presented with the opportunity to declare that, in light of Buckhannon, the State EAJA does not embrace the catalyst theory expressly declined to do so, stating that “we neither endorse nor repudiate” the theory (99 NY2d at 433).
Now we are once again presented with the opportunity to determine whether Buckhannon controls the State EAJA. After careful analysis and consideration, we decline to follow Auguste. There is no evidence to suggest that the New York State Legislature, in enacting the State EAJA, ever intended to eliminate attorneys’ fee awards under the catalyst theory. In fact, ample evidence supports the contrary conclusion. The legislature intended the statute to be applied as the federal law was interpreted at the time the State EAJA was enacted, and, in any event, the application of the Federal EAJA to the State EAJA was not meant to be all encompassing.
In this case, on September 16, 2010, the city respondents issued a notice of decision to petitioner, a disabled person, reduc *83 ing the amount of the “[Restricted shelter payment” component of petitioner’s public assistance benefits by approximately $200 per month. Petitioner requested a fair hearing before the New York State Office of Temporary and Disability Assistance (OTDA) to challenge this reduction. At the hearing, the Human Resources Administration stipulated to withdraw its notice of decision and to restore any lost benefits. OTDA thereafter issued a decision after fair hearing (DAFH) ordering the city respondents to withdraw the September 16, 2010 notice of decision and restore petitioner’s benefits, retroactive to the date of the action reducing the benefits. However, the city respondents failed to comply with the DAFH.
Thus, petitioner commenced this CPLR article 78 proceeding seeking enforcement of the DAFH and attorneys’ fees under the State EAJA. Two weeks later, the city respondents complied with the DAFH and retroactively restored petitioner’s shelter allowance benefits. Respondents then moved to dismiss the proceeding on mootness grounds.
The article 78 court dismissed the petition as moot. It also denied petitioner’s application for attorneys’ fees. Noting that she had not obtained an enforceable judgment, the court rejected petitioner’s assertion that she was a prevailing party under the catalyst theory. While the court found that petitioner’s article 78 proceeding was “undoubtedly” the catalyst for respondents’ eventual compliance with the DAFH, that respondents’ delay was arbitrary, and that the petition “was the only way left for [petitioner] to get their attention after being ignored for months,” it held that this did not make petitioner a prevailing party under New York law in light of Auguste.
CPLR 8600 provides as follows:
“It is the intent of this article, which may hereafter be known and cited as the ‘New York State Equal Access to Justice Act’, to create a mechanism authorizing the recovery of counsel fees and other reasonable expenses in certain actions against the state of New York, similar to the provisions of federal law contained in 28 U.S.C. § 2412(d) and the significant body of case law that has evolved thereunder” (footnote omitted).
CPLR 8601, the operative section of the statute, provides as follows:
“Fees and other expenses in certain actions against the state
*84 “(a) When awarded. In addition to costs, disbursements and additional allowances awarded pursuant to sections eight thousand two hundred one through eight thousand two hundred four and eight thousand three hundred one through eight thousand three hundred three of this chapter, and except as otherwise specifically provided by statute, a court shall award to a prevailing party, other than the state, fees and other expenses incurred by such party in any civil action brought against the state, unless the court finds that the position of the state was substantially justified or that special circumstances make an award unjust. Whether the position of the state was substantially justified shall be determined solely on the basis of the record before the agency or official whose act, acts, or failure to act gave rise to the civil action. Fees shall be determined pursuant to prevailing market rates for the kind and quality of the services furnished, except that fees and expenses may not be awarded to a party for any portion of the litigation in which the party has unreasonably protracted the proceedings.
“(b) Application for fees. A party seeking an award of fees and other expenses shall, within thirty days of final judgment in the action, submit to the court an application which sets forth (1) the facts supporting the claim that the party is a prevailing party and is eligible to receive an award under this section, (2) the amount sought, and (3) an itemized statement from every attorney or expert witness for whom fees or expenses are sought stating the actual time expended and the rate at which such fees and other expenses are claimed.”
The term “prevailing party” is defined as “a plaintiff or petitioner in the civil action against the state who prevails in whole or in substantial part where such party and the state prevail upon separate issues” (CPLR 8602 [f]). “ ‘Final judgment’ means a judgment that is final and not appealable, and settlement” (CPLR 8602 [c]).
When interpreting any statute, this Court is required, first and foremost, to give effect to the intent of the legislature (see Patrolmen’s Benevolent Assn. of City of N.Y. v City of New York, 41 NY2d 205, 208 [1976]). “Generally, inquiry must be made of the spirit and purpose of the legislation, which requires exami *85 nation of the statutory context of the provision as well as its legislative history” (Matter of Sutka v Conners, 73 NY2d 395, 403 [1989]). The “spirit and purpose” of the State EAJA are clear. The legislature desired to level the playing field for those without the necessary resources to challenge state action through litigation. Indeed, the sponsoring memorandum stated that the purpose behind the bill was “[t]o encourage individuals, small businesses and not-for-profit corporations to challenge State action when it lacks substantial justification by allowing them to recover fees and litigation expenses” (Sponsor’s Mem, Bill Jacket, L 1989, ch 770 at 12, 1989 NY Legis Ann at 334-335). The Governor’s approval memorandum referred to the legislation as “a worthwhile experiment in improving access to justice for individuals and businesses who may not have the resources to sustain a long legal battle against an agency that is acting without justification” (Governor’s Approval Mem, Bill Jacket, L 1989, ch 770 at 20, 1989 NY Legis Ann at 336). Petitioner points out that organizations that advocated for passage of the legislation, such as the New York State Bar Association, viewed the lack of availability of counsel to represent low-income individuals as a veritable crisis at the time. She further claims that the problem is just as bad, if not worse, in today’s difficult economic climate, in which, as the Chief Judge stated in announcing his decision to assemble a “Task Force to Expand Access to Civil Legal Services in New York,” “a rapidly growing number of litigants—two million at last count—have no choice but to go to court without the help of a trained professional who knows the law and how to navigate the court system” (Chief Judge Jonathan Lippman, 2010 Law Day Address, Law in the 21st Century: Enduring Traditions, Emerging Challenges [May 3, 2010], available at http://www.nycourts.gov/ctapps/ LD10Transcript.pdf at 16).
Of course, the State EAJA was also designed to place limits on the availability of fees. Thus, the only parties eligible to apply for attorneys’ fees are individuals with a net worth (excluding the value of a principal residence) of $50,000 or less and owners of businesses with 100 employees or less (CPLR 8602 [d]). Further, fees are not available if the State can establish that its position was substantially justified or that other circumstances militated against a fee award (CPLR 8601 [a]). These “necessary safeguards” are what persuaded the Governor to declare the State EAJA “different” from similar bills that he had vetoed in the past. The limitations, he noted, would “not deter *86 State agencies from pursuing legitimate goals and [would contain] adequate restraints on the amount of fees awarded” (Governor’s Approval Mem, Bill Jacket, L 1989, ch 770 at 20, 1989 NY Legis Ann at 336). In this case, we must determine whether the competing goals of expanding access to the courts through the availability of attorneys’ fees while maintaining mechanisms to prevent a raid of the State’s coffers could not both be accommodated by interpreting the State EAJA as permitting the award of fees under the catalyst theory.
Respondents first argue that the plain language of CPLR 8601 (a) prevents the application of the catalyst theory, because, they assert, that section provides that an award of fees may be awarded to a prevailing party “[i]n addition to” costs and disbursements. Because costs and disbursements are dependent on the entry of a judgment, they maintain, a “prevailing party” must be a party that secured a judgment. This argument is unpersuasive. In defining the term “prevailing party,” the legislature did not require the entry of a judgment (CPLR 8602 [f]). The specific definition of the term “prevailing party” trumps the general language in section 8601 (a) that respondents attempt to construe in their favor.
The principal argument offered by respondents, of course, is that the State EAJA was expressly declared to be similar to the Federal EAJA and the federal decisions interpreting the latter. Thus, they assert, regardless of whether federal courts interpreted “prevailing party” to embrace the catalyst theory before May 2001, Buckhannon required New York courts to hold, from that point forward, that the catalyst theory was invalid. Buckhannon involved fee-shifting provisions in the Fair Housing Amendments Act of 1988 and the Americans with Disabilities Act of 1990. The Court, attempting to discern whether the term “prevailing party” employed in those statutes embraced plaintiffs whose lawsuits were the catalyst for favorable voluntary action by the defendant, interpreted its own precedents as establishing that only “enforceable judgments on the merits and court-ordered consent decrees create the ‘material alteration of the legal relationship of the parties’ necessary to permit an award of attorney’s fees” (532 US at 604). Although Buckhannon did not consider the definition of “prevailing party” in the context of the Federal EAJA, its reasoning has been almost universally extended to that statute (see e.g. Ma v Chertoff, 547 F3d 342, 344 [2d Cir 2008]).
The initial problem with this argument is that CPLR 8600 provides that the State EAJA was intended only to be “similar” *87 to the federal BAJA, not identical. Indeed, in comparing the State BAJA to its federal counterpart, it is obvious that, as the Court of Appeals has noted, “the Legislature departed from the Federal model in certain significant respects” (Matter of New York State Clinical Lab. Assn. v Kaladjian, 85 NY2d 346, 353 [1995]). There are at least three substantive differences in the way the two statutes are written. First, the scope of the state statute is far narrower than that of the federal statute. Again, the former limits eligible parties to individuals with a net worth of $50,000 or less and owners of businesses with 100 employees or less, while the latter embraces individuals with a net worth of $2,000,000 or less and businesses with 500 employees or fewer (compare CPLR 8602 [d] with 28 USC § 2412 [d] [1] [D] [2] [B]). Another significant difference between the two statutes is that only the New York statute defines the term “prevailing party.” The federal statute defines that term only for eminent domain proceedings (see 28 USC § 2412 [d] [1] [D] [2] [H]). Finally, the Federal BAJA defines “final judgment” as “a judgment that is final and not appealable, and includes an order of settlement” (28 USC § 2412 [d] [1] [D] [2] [G]), but the State BAJA provides that the same term “means a judgment that is final and not appealable, and settlement” (CPLR 8602 [c]).
These differences seriously undermine respondents’ argument that the two statutes should be treated identically for all purposes. To the contrary, each of the three differences supports the argument that the legislature’s intention was to follow the Federal BAJA only for limited purposes. Thus, for example, by expressly choosing to narrow the class of plaintiffs and petitioners to whom attorneys’ fees are available in comparison to the class identified in the Federal BAJA, it can be presumed that the legislature considered all of the ways in which it could have made the statute more restrictive than the federal law, and incorporated into the new law only those changes that it deemed necessary to satisfy the Governor’s desire to place “ ‘adequate restraints on the amount of fees awarded’ ” (Kaladjian, 85 NY2d at 354, quoting 1989 NY Legis Ann at 336). It is a critical fact that, at the time CPLR article 86 was enacted in 1989, the “significant body” of case law across the country and in New York that had interpreted the Federal BAJA routinely applied the catalyst theory (see Buckhannon, 532 US at 602 n 3 [citing decisions from Courts of Appeals of 1st, 2d, 3d, 6th, 7th, 8th, 9th, 10th and 11th Circuits that recognized the theory]; see e.g. United Assn. of Journeymen & Apprentices of the Plumbing & *88 Pipefitting Indus. of the U.S. & Can., Local Union No. 112 v United States Dept. of Hous. & Urban Dev., 1986 WL 13880, 1986 US Dist LEXIS 16765 [ND NY 1986]; Correa v Heckler, 587 F Supp 1216 [SD NY 1984]; Williamson v Secretary of U.S. Dept. of Hous. & Urban Dev., 553 F Supp 542 [ED NY 1982]). Where New York State courts had the opportunity to interpret federal fee-shifting statutes, they too recognized the catalyst theory (see e.g. Jones v Koch, 117 AD2d 647 [2d Dept 1986], lv denied 68 NY2d 608 [1986]). If the legislature had deemed it necessary to restrict the statute further by eliminating application of the theory, it would have incorporated that into the text.
The second significant difference between the two statutes is that only the State EAJA provides a definition for the term “prevailing party.” The absence of any statutory definition in the federal statute made it necessary for the Supreme Court in Buckhannon to provide a definition for the term, drawing on its own precedents. However, in the case of the State EAJA, there is no need to search for the meaning of the term, because it is already supplied by the statute. “[W]here the statutory language is clear and unambiguous, the court should construe it so as to give effect to the plain meaning of the words used” (Patrolmen’s Benevolent Assn., 41 NY2d at 208). In this instance, the term “prevail” is commonly defined as “to be or become effective or effectual” (Merriam-Webster’s Collegiate Dictionary [11th ed 2004]). Had the legislature desired to define the term further so as to clarify that some “judicial imprimatur” was necessary, again, it knew how to do so. There is no question that petitioner’s commencement of an article 78 proceeding against the state in this case was “effective” in causing the state to comply with the DAFH.
Significantly, the Court of Appeals has already drawn clear distinctions between the State EAJA and the Federal EAJA with respect to what it means to “prevail.” In Kaladjian (85 NY2d at 353-354), the Court set out to determine what the legislature meant in referring to a party that prevails “in substantial part” (CPLR 8602 [f]). The Court noted that
“[although the legislative history offers no definitive elucidation regarding which of the two possible meanings of the word ‘substantial’ the Legislature intended, the Legislature’s departure from the Federal EAJA in our view evinces an intent to impose a stricter standard for demonstrating prevailing party status under the State EAJA than under its Federal counterpart” (id. at 354).
*89 If the legislature could depart from the Federal EAJA in determining what it means to prevail, then it was perfectly capable of departing in determining whether the catalyst theory was available.
Respondents argue that the Court of Appeals’ observation in Kaladjian that the legislature intended to apply a stricter standard in the State EAJA than its federal counterpart supports their position that the legislature would not have favored application of the catalyst theory. This is incorrect. Kaladjian was concerned with the degree of success necessary to warrant an award of attorneys’ fees, holding that a plaintiff seeking fees under the State EAJA has to show a greater degree of success than its federal counterpart; it must show that “it succeeded in large or substantial part by identifying the original goals of the litigation and by demonstrating the comparative substantiality of the relief actually obtained” (id. at 355). This, the Court observed, was consistent with the Governor’s desire to limit the potential economic impact of the legislation. However, awarding fees to a party that, like petitioner, obtains all of its litigation goals by commencing an action or proceeding does not at all conflict with the notion, advanced in Kaladjian, that fees should only be awarded where there is a close relationship between the outcome sought and the outcome obtained.
Finally, the third significant difference between the State EAJA and the Federal EAJA is that the latter defines the term “final judgment,” the predicate for a fee application in both statutes, as including an “order of settlement,” while the New York Legislature provided that “final judgment” can include a mere “settlement.” It can be presumed that the legislature’s exclusion of the words “order of’ was intentional, and meant to broaden the types of settlements eligible to support an application for attorneys’ fees. Further, the elimination of words that would otherwise imply the need for a judicial imprimatur negates the holding in Buckhannon that even a voluntary relinquishment of the State’s position must be judicially sanctioned.
In addition to the actual language employed in the State EAJA, the legislative history suggests that the legislature, in modeling the legislation on the Federal EAJA, did not intend to do so for all purposes. Rather, it strongly appears that by referencing in CPLR 8600 the “significant body” of case law that had interpreted the Federal Equal Access to Justice Act, the legislature was focused on a narrow range of issues which it *90 intended to be addressed consistently with the manner in which courts had construed the Federal EAJA. This is evident from the sponsoring Assemblyman’s October 4, 1989 letter to the Governor’s counsel, which stated:
“I wanted to clarify the language and legislative intent of A.3313-B, the Equal Access to Justice Act (EAJA), which I sponsored in the Assembly.
“The more appropriate reference to federal law in CPLR 8600, as added by the EAJA, is to 28 U.S.C. 2412(d) rather than 5 U.S.C. 504. It was the Legislature’s intention to incorporate into state law the significant body of case law that has construed 28 U.S.C. 2412(d), including the United States Supreme Court decision in Pierce v. Underwood, 56 U.S.L.W. 1806 (1988).
“In particular, the ‘substantially justified’ standard discussed in the Pierce majority decision should serve as the controlling interpretation of that phrase in the New York EAJA. In addition, the Supreme Court’s discussion of limitations on fee awards should serve as the interpretive standard for the New York EAJA (see 56 U.S.L.W at 4811-12).
“For example, as the Supreme Court confirmed, multipliers used to enhance fee awards are not appropriate under the EAJA, and we did not contemplate them for the New York EAJA. In addition, factors such as contingent fee arrangements, the novelty of a case, or the result obtained should not be used to increase the amount of the fee awarded. Further, the prevailing market rate for the legal services necessary should serve as the standard for fee awards, not the fees actually charged by the attorneys in a specific case. Thus, if a person hires a high-priced law firm in a successful EAJA action, the fee award should be based on the market rate cost of the legal services offered, not that particular firm’s rate unless there was an unusual type of expertise required that only that one firm could supply. . . .
“The term ‘administrative proceeding’ contained in the definition of permissible fees (CPLR 8602 [b]), was intended to include only those administrative *91 proceedings that occur as a result of the EAJA litigation, including hearings on remand, not the administrative proceedings that may precede a judicial action. This comports with the federal case law construing 28 U.S.C. 2412(d)” (Sponsor’s Mem, Bill Jacket, L 1989, ch 770 at 8-9 [emphases supplied]).
By making specific reference to Pierce v Underwood and other federal case law construing the term “administrative proceeding,” the memorandum suggests that the legislature had specific concerns about the potential scope of the State EAJA and that it agreed with the way those issues had been addressed by the Pierce Court and other courts. In light of those very specific concerns, it is not reasonable to assume that the legislature wished each and every conceivable permutation of the State EAJA, including the availability of the catalyst theory, to be construed consistently with the federal courts’ construction. Indeed, the Court of Appeals already recognized this, when it found in Kaladjian that the federal courts’ interpretation of the term “prevailing party” was inapplicable to the State EAJA.
Because the Federal EAJA only informs the operation of the State EAJA for limited purposes, this Court is required to interpret the statute independently, and not to blindly follow the manner in which the Federal EAJA has been interpreted by Buckhannon and its progeny. Respondents argue that if the state statute were considered in its own light, the catalyst theory would still not apply, because it conflicts with the legislature’s intent to limit the State’s fee liability. This position of course ignores the legislature’s equally strong desire to expand access to justice, which the catalyst theory certainly assists in doing. Nothing in the legislative history suggests that one goal outweighed the other.
The dissent’s statement that “all of the considerations now raised by the petitioner and majority were available when we unanimously decided Auguste” pays little heed to the fact, noted above, that Buckhannon was decided after the parties in Auguste had submitted their briefs and argued that appeal to this Court. The dissent’s contention that this is of no moment because Buckhannon “form[ed] the basis of our decision in Wittlinger [289 AD2d at 171]” is disingenuous as well, since we relied solely on Auguste in deciding Wittlinger, and did not perform the searching analysis of the State EAJA and Buckhannon’s impact on the statute that we engage in now. In discuss *92 ing the merits of the catalyst theory, the dissent appears to advocate not only the demise of the theory, but the eradication of the entire fee-shifting statute. The dissent argues for the elimination of the catalyst theory by relying on the Court of Appeals’ affirmance of Wittlinger (99 NY2d at 425). However, the Court of Appeals in Wittlinger expressly declined to take a position on the wisdom of the catalyst theory, instead assuming, without deciding, that it did apply and finding that the agency had sufficient justification for the delay in delivering the petitioner’s public assistance benefits. Nevertheless, the dissent states that the Court of Appeals “acknowledged” in Wittlinger that “the use of the catalyst theory as a method of determining whether to award attorneys’ fees is not the appropriate remedy to punish [agency] delays or encourage prompt state action.” The dissent further states that “[although the delay in this case exceeds that in Wittlinger, the same logic applies, particularly since petitioner has not shown that she suffered any harm from the delay in providing her landlord with the retroactive payments in question.”
Initially, it is important to note that respondents do not address on this appeal the issue whether their actions were substantially justified. In any event, nothing in Wittlinger suggests, as the dissent would have it, that the Court of Appeals presumed agency delay to have been substantially justified in all but the most egregious cases, thus militating against any use of a catalyst theory. Nor do we believe, as the dissent states, that the reverse presumption exists. That there are no such presumptions was made clear in Wittlinger, where the Court stated that “[w]hether prolonged inaction will fail the substantial justification test necessarily depends on the circumstances. . . . [I]n each case a reviewing court must determine how long it should have taken the agency to act, considering the reasons offered by the agency for the delay” (99 NY2d at 432).
If the dissent’s interpretation of Wittlinger were carried to its logical conclusion, the State EAJA would be eviscerated. That is because the dissent believes that, in a case such as this one, whether a person’s grievance is vindicated by judicial fiat or by voluntary state action, the possibility of a fee award creates a perverse incentive to litigate. According to the dissent, “sufficient remedies such as costs and sanctions exist for those cases in which the agency unjustifiably refuses to act pursuant to a settlement or court order.” This goes even further than the Supreme Court did in Buckhannon. Certainly it directly *93 contradicts the explicitly stated purpose of the State EAJA, which is to encourage litigation against recalcitrant state agencies. The availability of costs and sanctions to a litigant would not alone entice able counsel to take on the cause.
There is no reason to believe that the catalyst theory threatens the legislature’s efforts to ward off an avalanche of fee awards. Certainly the theory does not interfere with the State EAJA’s safeguards, such as the limited class of eligible plaintiffs and the safety valve of a demonstration of substantial justification. If anything, preservation of the catalyst theory is critical to achieving the legislative purpose behind the State EAJA. Notably, the dissent does not dispute the legislative history indicating that the legislature did not intend to march in lockstep with the federal courts in interpreting the State EAJA, nor does it discuss the qualitative differences between the state law and its federal counterpart. Nothing, including the Buckhannon decision, has occurred since the enactment of the State EAJA that compels the conclusion that New York courts should not apply the theory. The dissent’s position that nothing in the State EAJA precludes this Court from deciding at this time that the catalyst theory is not available conflicts with its other, and more apt, observation that only the legislature should make such a public policy determination.
As petitioner argues, if respondents’ position were upheld, aggrieved but impecunious parties would be hard-pressed to find qualified attorneys to commence cases for them, since they would have no assurance of being compensated. It would be inconsistent with the laudatory goals of the State EAJA to interpret the legislation as depriving plaintiffs of attorneys’ fees simply because the State decided to concede its position. Because there is no evidence that the legislature would have desired such a result, we must conclude that the catalyst theory applies to the State EAJA.
Accordingly, the order and judgment (one paper) of the Supreme Court, New York County (Alexander W. Hunter, Jr., J.; see 2011 NY Slip Op 33638[U] [2011]), entered July 18, 2011, which dismissed as moot the petition brought in a hybrid CPLR article 78/declaratory judgment proceeding, and denied petitioner’s application for counsel fees pursuant to CPLR article 86, should be reversed, on the law, without costs, the application granted, and the matter remanded for a hearing on the appropriate amount of counsel fees to be awarded to petitioner.